**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JORDAN PENLAND, KARL GERNER, EDWARD R. BURKE, AND PAUL C. BURKE, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | Judge John Robert Blakey |
| | ) | |
| vs. | ) ) | Case No. 1:21-cv-05581 |
| | ) | |
| CHICAGO PARK DISTRICT, SOLDIER FIELD, AND ASM GLOBAL, | ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Defendants SMG d/b/a ASM Global ("SMG") (erroneously named and served as "ASM Global") and the Chicago Park District (the "Park District"), respectfully move this Court for an order pursuant to Fed. R. Civ. P. 12(b)(6) dismissing the Second Cause of Action ("Count Two") of Plaintiffs' Complaint ("Complaint") against both SMG and Park District, and dismissing the First Cause of Action ("Count One") against the Park District.

## INTRODUCTION

In a Complaint rife with hyperbole but short on facts sufficient to state a claim, Plaintiffs Jordan Penland, Karl Gerner, Edward Burke, and Paul Burke (collectively "Plaintiffs") go to great lengths to make it seem as if SMG, the Park District (each individually "Defendant" and collectively "Defendants") and Soldier Field[1] engaged in a grand conspiracy with unknown

---

[1] While Plaintiffs name Soldier Field as a defendant, Soldier Field is not a separate legal entity capable of being sued, but rather a Park District facility that is marketed and operated under the name Soldier Field. As such, references herein to the Park District as a Defendant are inclusive of Soldier Field throughout.

and unidentifiable "fans of Mexico's national [soccer] team" to commit a hate crime against them at a soccer match in 2019. Nothing about the claim is facially plausible.

Plaintiffs entirely fail to identify *any* agreement between these unidentified "fans of Mexico" and Defendants whatsoever – a crucial element to any *prima facie* civil conspiracy claim – nor do they explain *how* the nebulous "fans of Mexico" *could* have entered into any such agreement. Beyond the speculative nature of Plaintiffs' allegations are hollow conclusions that a conspiracy existed among Defendants, on the one hand, and an unscrupulous crowd of soccer match attendees, on the other, to engage in alleged unlawful conduct. Even the commission of the purported crime itself – disorderly conduct – is speculative in nature, as Plaintiffs fail to allege a single fact suggesting that anyone actually committed any crime beyond "thunderous" chanting. Plaintiffs even admit that no fan was charged with any crime. Brash and uncouth as the alleged homophobic chant no doubt is, these are precisely the speculative allegations courts rightfully reject under Rule 12(b)(6) as failing to support a plausible civil conspiracy claim. And for good reason; to allow such claims to survive would permit any would-be-plaintiff to file a civil conspiracy claim against any person or entity that is accidentally, inadvertently, or even negligently, caught up in a third party's unlawful behavior.

In addition, Plaintiffs' claims against the Park District are barred by the Illinois Tort Immunity Act, which shields Park District from liability for any alleged failure to act to prevent violations of law. When stripped of its hyperbole, that is exactly what Plaintiffs' Complaint seeks to do here – hold the Park District liable for allegedly not enforcing either the Illinois Human Rights Act or to prevent other actors from engaging in disorderly conduct. For these reasons, Count Two should be dismissed with prejudice against all Defendants, and Count One should be dismissed with prejudice against Park District.

## BACKGROUND

### I.   Procedural Posture

Plaintiffs' Complaint asserts two causes of action. Count One alleges public accommodations discrimination based on sexual orientation under the Illinois Human Rights Act ("IHRA"). [Compl. ¶¶ 211–32.] Count Two alleges that Defendants engaged in a conspiracy to commit a hate crime based on the alleged disorderly conduct of the "fans of Mexico's national [soccer] team" during a July 7, 2019 soccer match at Soldier Field. [Compl. ¶¶ 233–46.]

Plaintiffs initially filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR") alleging violations of the Illinois Human Rights Act against the Park District, Soldier Field. [Compl. ¶ Intro.] Pursuant to the contractual arrangement between SMG and the Park District, SMG and the Park District jointly responded to the charge. [*Id.*; Compl. ¶¶ 7, 26] On or about April 21, 2021, the IDHR issued Notices of Substantial Evidence and Dismissal, after which Plaintiffs commenced this action on or about July 6, 2021. [*Id.*]

### II.   Factual Allegations[2]

#### A.   The Management Contract, The Event Contract, and CONCACAF's Three Step Match Protocol

The Park District, a municipal corporation, contracts with SMG to provide operations and management services at the Park District's Soldier Field facility under a management contract (the "Management Contract"). [Compl. ¶ 7.] The Management Contract, among other things, requires that SMG provide "security, crowd, management, and medical services at [Soldier Field] for the customers, employees, visitors, and users of [Soldier Field]."

---

[2] For the purposes of this Motion, Defendants take the allegations in the Complaint as true under applicable legal standards. Nothing contained herein, however, shall be construed as an admission as to the truth or veracity of any allegation in the Complaint. Defendants reserve the right to deny any and all allegations made in the Complaint, assert all relevant defenses, and assert any relevant counter- or cross-claims.

[Compl. ¶ 26.]  It also requires SMG and the Park District to comply with all applicable laws. [Compl. ¶ 27.]

In turn, SMG entered into an events contract with the Soccer United Marketing, LLC, an agent of the Confederation of North, Central America and Caribbean Association Football ("CONCACAF").  [Compl. ¶ 29.]  CONCACAF presented the July 7, 2019 Gold Cup Final (the "Gold Cup Final") soccer match at Soldier Field, between the national teams of Mexico and the United States.  [*Id.*]

According to Plaintiffs, CONCACAF has a "match protocol for addressing discriminatory events" (the "Three Step Match Protocol") during soccer matches it sponsors. [Compl. ¶ 34.]  The Three Step Match Protocol should be used when event attendees engage in disruptive chants or other conduct.  [*Id.*]  The Three Step Match Protocol involves suspending the match and waiting for the attendees to stop engaging in undesired conduct.  [Compl. ¶ 36.]

Plaintiffs allege that the Three Step Match Protocol effectively stopped discriminatory chanting at a match at least once (*i.e.*, prior to the Gold Cup Final), but that CONCACAF did not at the time consistently implement the protocol.  [Compl. ¶¶ 24–37.] Plaintiffs also allege that Defendants were aware of CONCACAF's inconsistent history of enforcing the Three Step Match Protocol at the time SMG contracted with CONCACAF to host the Gold Cup Final.  [Compl. ¶ 34.]

## B. Plaintiffs Attended The Gold Cup Final and Were Allegedly Subjected To Discriminatory Conduct

On July 7, 2019, Plaintiffs attended the Gold Cup Final at Soldier Field.  [Compl. ¶ 10.]  During the match, some of the "supporters" or "fans" of Mexico's national team used a chant in Spanish that, in English, means "male prostitute" or something similar.  [Compl. ¶ 12.]

The chant is regarded as a homophobic slur that team Mexico's fans use when the opposing team takes a goal kick.  [Compl. ¶¶ 17, 19.]

Prior to the Gold Cup Final, in a letter to Soldier Field's Assistant General Manager, Plaintiff Paul Burke allegedly notified the Park District of his plan to attend the Gold Cup Final, and discussed the history of the homophobic chant and CONCACAF's failure to prevent it.  [Compl. ¶ 40.]  Paul Burke sent a similar message through the Park District's online portal to the Park District's general counsel.  [Compl. ¶¶ 39–40.]  In his letter, Paul Burke stated that he anticipated the chant would occur during the Gold Cup Final and that he viewed the chant as unlawful, and sought written assurance that "LGBT fans [would] be afforded full and equal enjoyment of the event in compliance with the [law]."  [Compl. ¶ 40.]

Despite this purported warning, attendees of the Gold Cup Final allegedly used the chant approximately two dozen times during the match.  [Compl. ¶¶ 12, 17, 19.]  Plaintiffs, dressed in clothing celebrating LGBT pride and displaying rainbow colored numbers, allege that "hundreds of Mexico fans" could identify and associate them with the LGBT community and some appeared to direct their use of the homophobic chant toward them.  [Compl. ¶ 49.]

After Plaintiffs witnessed the chant, they purportedly sought to report it to Soldier Field via text message using a number published in the online facility guide; that number, according to Plaintiffs, was incorrect.  [Compl. ¶¶ 51, 53.]  So, at halftime, Plaintiffs allegedly reported the chant to "stadium officials and a security guard."  [Compl. ¶ 54.]  Notwithstanding Plaintiffs' reports, by the end of the Gold Cup Final Plaintiffs allegedly overheard the chant between twenty-five and twenty-eight times.  [Compl. ¶ 174–75.]  To Plaintiffs' knowledge, no action was taken by Defendants or CONCACAF to stop the chant, including implementation by CONCACAF of its Three Step Match Protocol.  [Compl. ¶¶ 55–173, 176.]

Plaintiffs allege that the use of the chant constituted disorderly conduct, motivated by gender, gender identity, or sexual identity, and therefore constitutes a hate crime under Illinois law. [Compl. ¶¶ 187–93, 234–37.] No individual was prosecuted for such purported disorderly conduct occurring during the Gold Cup Final. [Compl. ¶ 193.] Additionally, there is no factual allegation that Defendants acted either directly or indirectly with any fan or group of fans of team Mexico using the purported chant before or during the match.

Plaintiffs nevertheless conclude that the "[f]ans of Mexico's national team" and each Defendant "sought to hold the Gold Cup Final under anti-LGBT conditions through unlawful means," despite Paul Burke's warnings to the Park District before, and Plaintiffs' attempts to report the use of the chant during, the Gold Cup Final. [Compl. ¶¶ 242–45.]

## LEGAL STANDARD

A court considering a Rule 12(b)(6) motion to dismiss accepts all well-pleaded allegations in the complaint as true and draws all inferences in the light most favorable to the plaintiff. *De David v. Alaron Trading Corp.*, 796 F. Supp. 2d 915, 920 (N.D. Ill. 2010). "The allegations must plausibly suggest that the plaintiff has a right to relief, raising the possibility above the 'speculative level.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). Dismissal under Rule 12(b)(6) is warranted if the complaint fails to establish that the requested relief is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 544, 555 (2009)). Whether to dismiss a claim with prejudice is committed to the discretion of the court, but is appropriate when "it is clear that the defect cannot be corrected" and that therefore an "amendment is futile." *Davis v. MRS BPO, LLC*, No. 15-2303, 2015 WL 4326900, at *3 (N.D. Ill. July 15, 2015) (quoting *Runnion v. Girl Scouts of Great Chi. & Nw. Ind.*, 768 F.3d 510, 520 (7th Cir. 2015)); *Johns v. Morris*, 777 F.2d 1277, 1279 (7th Cir. 1985).

6

## ARGUMENT

### I.    Plaintiffs Have Not Established A *Prima Facie* Civil Conspiracy Claim

To prove civil conspiracy, a plaintiff must show "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnson*, 807 N.E.2d 461, 470 (Ill. 2004). A civil conspiracy claim extends liability beyond an active wrongdoer to those who have "encouraged, aided, or helped plan" the wrongdoer's acts. *Miller v. Hecox*, 969 N.E.2d 914, 924 (Ill. App. 2d 2012). Because civil conspiracy is an intentional tort, "accidental, inadvertent, or [even] negligent participation in a common scheme does not amount to a conspiracy." *Mohammed v. Hamdard Ctr. for Health & Hum. Servs.*, 2020 Ill. App. 2d 181017-U (Ill. App. Ct. 2020); *see also McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999). Further, "[m]ere knowledge of . . . illegal actions of another is . . . not enough to show a conspiracy." *McClure*, 720 N.E.2d at 188 Ill. 2d at 258. It is thus essential that there be an **agreement** to accomplish an unlawful act – something more than mere conclusory allegations that there was a conspiracy between actors. *Mohammed*, 2020 IL App (2d) 181017-U, at ¶45.

### II.   Defendants' Purported Knowledge Of Team Mexico Fans' Past Use Of The Chant Is Insufficient to State a Civil Conspiracy Claim

Plaintiffs attempt to make hay about the "knowledge" that Defendants allegedly had about the propensity of Mexico's fans to use the chant during matches, but fail to connect that alleged knowledge to any *intent* or *agreement* Defendants had to engage in the purported conspiracy. Setting aside the presumptuous conclusion that Defendants possessed such knowledge, that knowledge alone does not suffice to state a civil conspiracy claim. Only an intent to act on such knowledge does. *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994)

("[A] civil conspiracy is based upon intentional activity, [and] the element of intent is [only] satisfied when a defendant knowingly and voluntarily participates in a common scheme to commit an unlawful act or a lawful act in an unlawful manner").

Moreover, even considering the letter Paul Burke sent to the Park District before the match, the undelivered text message to the Soldier Field hotline, and the purported report to facility security during the match, Plaintiffs do not and cannot allege any form of agreement between any Defendant and the Mexico team fans to "accomplish by concerted action" a hate crime under Illinois law. In other words, nothing expressly or impliedly demonstrates an intent on Defendants' part to engage in the conspiracy to commit a crime, regardless of any knowledge they purportedly had.

To infer anything more from Plaintiffs' conclusory allegations than the "accidental, inadvertent, or negligent participation" of the Defendants in the purported scheme would be to create facts where none exist. "The mere characterization of a combination of acts as a conspiracy is insufficient to withstand a motion to dismiss." *Buckner v. Atlantic Plant Maint.*, 694 N.E.2d 565, 571 (Ill. 1998); *see also Twombly*, 550 U.S. at 555–56 (a complaint must bring the right to relief above the speculative level). Plaintiffs fail to allege any intent to participate in the alleged conspiracy, let alone any tacit agreement to do so, and no reasonable inferences to the contrary can be drawn from the facts as alleged in the Complaint.

Courts routinely dismiss civil conspiracy claims for failure to identify an agreement between the defendants (*i.e.*, the who, what, where, or when of the agreement) – and rightly so. *See, e.g.*, *Peterson v. A Clear Title & Escrow Exch.*, No. 14-cv-09932, 2017 WL 1134483, at *4 (N.D. Ill. Mar. 27, 2017) (dismissing a civil conspiracy claim where plaintiff failed to identify the who, the when, or the what of the agreement). Absent an agreement to

perform an unlawful act among identifiable co-conspirators, the tort of civil conspiracy could logically extend to the extreme, implicating innocent actors into others' unlawful conduct.

For example, in *Davidson v. Worldwide Asset Purchasing, LLC*, the plaintiff brought an action against three debt collection agencies. 914 F. Supp. 2d 918, 924 (N.D. Ill. 2012). One of the three agencies, "West," owned the other two. The three agencies allegedly conspired to engage in collection activities without licenses required by Illinois law, and that West was directing the activities of the other two agencies. The entities were allegedly distinguishable in name only – that they shared common employees and officers and engaged in similar business practices. *Id.* at 920. In holding the plaintiff failed alleged existence of an agreement, the mere commonality of three agencies' officers and employees participating in the purported conspiracy, without more, was not enough to support a claim. *Id.* Rather, a plaintiff must "point to evidence showing the existence of a conspiracy and each defendant's knowing participation in the conspiracy," and "allege specific facts warranting an inference that [each defendant was] a member." *Id.*

Likewise, the plaintiff in *Independent Trust Corp. v. Stewart Information Services Corp.*, alleged a civil conspiracy to misappropriate funds. The plaintiff, Independent Trust Corporation, ("Independent") was a trustee for thousands of trust accounts. 665 F.3d 930 (7th Cir. 2012). Two of its directors, Laurence Capriotti and Jack Hargrove, ran a separate company called Intercounty. *Id.* at 933. Intercounty operated as an agent of the defendants, Stewart Information Services Corporation, Stewart Title Guaranty Company, and Stewart Title Company (collectively "Stewart"). *Id.* As part of its business, Intercounty managed an escrow account, which Stewart agreed to insure. *Id.* It turned out, however, that Capriotti and Hargrove were

essentially managing the escrow account as a Ponzi scheme, and were misappropriating Independent's funds to fill the escrow shortages. *Id.*

Independent alleged Stewart conspired with Capriotti and Hargrove to misappropriate funds. *Id.* at 938. Stewart allegedly knew of the misappropriation because, as an owner of Intercounty stock, it received monthly financial and annual audited financial statements. It also alleged that Stewart had the contractual right to audit Intercounty and to sever its relationship with Intercounty at any time. Nevertheless, Independent alleged that when Stewart became aware of the Ponzi scheme, instead of auditing Intercounty or severing its relationship, Stewart waived Intercounty's contractual obligation to submit an annual audit and pressured Intercounty to find a source of funds to fill the escrow shortage. *Id.* at 939–40.

In concluding that Independent failed to allege a conspiracy, the Seventh Circuit explained that "the pressure Stewart exerted on Intercounty to fill the escrow gap, combined with its failure to prevent the fraud by either demanding an audit or terminating its underwriting agreement" did not amount to a conspiracy because Independent "simply failed to allege *an agreement.*" *Id.* at 940. "Stewart's failure to do more to prevent the fraud [does not make] it a co-conspirator . . . . To the contrary . . . in the absence of any evidence of an explicit or implicit agreement, a defendant's failure to prevent harm to a plaintiff does not amount to a conspiracy." *Id.* (citing *Tierney v. Vahle*, 304 F.3d 734, 739–40 (7th Cir. 2002)).[3]

---

[3] There are myriad examples of courts dismissing civil conspiracy claims due to the plaintiff failure to identify the details (*i.e.* the who, what, where and when) of an agreement. *E.g.*, *Wendler & Ezra, P.C. v. AIG, Inc.*, No. 4-cv-641, 2005 WL 1847085, at *3 (S.D. Ill. Aug. 3, 2005) (dismissing civil conspiracy claim where complaint failed to specify the parties involved, where the conspiracy took place, and its purpose or plan, and holding that federal notice pleading standards require more than bare allegations of a conspiracy, and that a complaint must define the form or scope of the conspiracy to survive Rule 12(b)(6)); *Triumph Packaging Grp. v. Ward*, 877 F. Supp. 2d 629, 644 (N.D. Ill. July 10, 2012) (dismissing a civil conspiracy claim where plaintiff failed to identify who the parties to the alleged agreement were, or the facts regarding the agreement); *Hanania v. Loren-Maltese*, 319 F. Supp. 2d 814, 834 (N.D. Ill. 2004) (dismissing civil conspiracy claim brought under 42 U.S.C. § 1983, where plaintiff alleged that he was terminated in violation of the First Amendment, because plaintiff failed to allege that the defendant who

In this case, like those cited *supra*, Plaintiffs have failed to make a single allegation suggesting that any of the relevant parties – SMG and the Park District, on the one hand, and the unidentified and amorphous fans of Mexico's soccer team, on the other hand – entered into an agreement of any kind between one another. To be sure, Plaintiffs' Complaint does not allege that any Defendant ever communicated with the "Fans of Mexico's national team" whatsoever. As noted above, accidental, inadvertent or negligent participation in a scheme does not make it a conspiracy; there must be some coordination and an agreement among the co-conspirators, along with "specific facts warranting an inference" that Defendants were members of the conspiracy, for such a claim to survive a motion to dismiss. *Ashok Arora v. Diversified Consultants, Inc.*, No. 20-4113, 2021 WL 2399978, at *5 (N.D. Ill. June 11, 2021) (concluding that, although a plaintiff need not "plead with complete particularity all details of a conspiracy or the exact role of each defendant, the plaintiff must provide some form or scope to the conspiracy"). None exists here.

Moreover, suffering the same flaws as the plaintiffs in *Davidson* and *Independent Trust*, the Complaint here fails to describe the alleged conspiracy's form or scope. For example, the Complaint does not explain the alleged roles each Defendant agreed to serve in furtherance of the purported conspiracy, and, although Plaintiffs point to the fans of Mexico as alleged co-conspirators, Plaintiffs fail to identify or name *any* individual person among those fans with whom Defendants directly (or even indirectly) conspired to commit the purported crime; indeed, they are not even named as defendants in this action. Like the plaintiffs in *Independent Trust*, Plaintiffs merely allege Defendants had knowledge of the historic use of the homophobic chant

_____

terminated him had entered into any agreement with anyone prior to terminating the defendant); *Peterson*, 2017 WL 1134483, at *4 (dismissing a civil conspiracy claim where plaintiff failed to identify who the parties to the alleged agreement were, when it took place, and what it consisted of).

and failed to take necessary steps to prevent it (or stop it) and thereby failed to prevent harm. However, "in the absence of any evidence of an explicit or implicit agreement, a defendant's failure to prevent harm to a plaintiff does not amount to a conspiracy." *Id.* at 940.

Simply put, Defendants' failure to do more to prevent the chant at the 2019 Gold Cup Final simply does not make them co-conspirators with Team Mexico fans, regardless of Defendants' purported knowledge of the propensity of those fans to use the chant. Thus, the factual allegations in the Complaint do not and cannot plausibly allege a civil conspiracy. Count Two should be dismissed with prejudice against both Defendants.

### III. Count Two Should Be Dismissed With Prejudice Because There Is No Person Or Legal Entity That Constitutes "fans of Mexico" And Thus They Cannot Be Part Of The Alleged Conspiracy

For Plaintiffs' claims to survive a Rule 12(b)(6) challenge, their Complaint must plausibly allege that Mexico's fans were part of an agreement to engage in disorderly conduct. Civil conspiracy is not an independent tort. *Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 735 N.E.2d 649, 662 (Ill. App. Ct. 2000). To state a conspiracy claim, a "plaintiff must allege not only that one of the conspirators committed an overt act in furtherance of the conspiracy, but also that such act was tortious or unlawful in character." *Adcock*, 645 N.E.2d at 894.

Here, Plaintiffs' Complaint does not allege that any of the named Defendants committed an overt act in furtherance of the alleged conspiracy; it only alleges that the indistinct and indefinite "fans of Mexico" engaged in an act in furtherance of the conspiracy to commit disorderly conduct. [Compl. ¶¶ 246.] In order to survive scrutiny under Rule 12(b)(6), however, Plaintiffs must plausibly allege that the fans of Mexico constitute a particular person or legal entity that agreed with Defendants to commit disorderly conduct. They cannot do so.

Simply put, the "fans of Mexico's national team" **cannot** plausibly be part of any alleged agreement to commit disorderly conduct. "[F]ans of Mexico's national team" is not a recognizable entity or person capable of entering into agreement. At best, the "fans of Mexico's national team" is a nebulous group of unidentifiable individuals who happened to attend the Gold Cup Final at a facility that Defendants either owned or operated and licensed to a third party that presented the match. Beyond this transitory connection among the parties relevant to Plaintiffs' conspiracy claim, no recognizable relationship among them existed that would otherwise give rise to an express or implied agreement to commit a hate crime. Absent a particular individual or group of individuals with whom Defendants conspired (*i.e.* "encouraged, aided, or helped plan" *Miller*, 969 N.E.2d at 924) to engage in disorderly conduct, no conspiracy claim exists. And if such particular individual or group of individual people existed, they would need to be identified by individual name, or in some more specific fashion than "fans of Mexico" to establish a plausible civil conspiracy claim. Plaintiffs did not do so, nor can they, because "fans of Mexico" does not exist as a legal form.

There is no set of facts Plaintiffs could allege to make it plausible that the "[f]ans of Mexico's national team" conspired with any of the Defendants to commit disorderly conduct at Soldier Field on July 7, 2019. Count Two should thus be dismissed with prejudice.

## IV. The Park District Is Immune From Plaintiffs' Counts One and Two Under the Illinois Tort Immunity Act

This Court should also dismiss both Counts One and Two as asserted against the Park District because the Park District is protected by the Illinois Local Government and Governmental Employees Tort Immunity Act, 745 ILCS 10/2-101, *et seq.* (the "Act") "A local public entity is not liable for an injury caused by . . . failing to enforce any law." *Id.* § 2-103. Likewise, "[a] public entity is not liable for an injury resulting from an act or omission of its

employee where the employee is not liable." *Id.* § 2-109. The Act applies to claims brought under Illinois common law or an Illinois statute, including claims brought under the Illinois Human Rights Act. *Mansfield v. Chi. Park Dist. Grp. Plan*, 946 F. Supp. 586, 593 (N.D. Ill. 1996); *C.f. Rozsavolgyi v. City of Aurora*, 58 N.E.3d 65, 99 (Ill. App. 2016), *vacated* 102 N.E.3d 162 (Ill. 2017). The Park District is a public entity protected by the Act. 745 ILCS 10/2-206.

Here, Count One seeks to hold the Park District liable for allegedly failing to "take necessary actions to protect LGBT patrons from anti-gay misconduct." [Compl. ¶ 223.] Plaintiffs further allege they "were denied their right to full benefit and equal enjoyment of the Gold Cup Final because the Chicago Park District, Soldier Field, and [SMG] failed in their respective duties to regulate fan conduct to protect the safety and dignity of LGBT fans." [Compl. ¶ 223.] Accordingly, Count One falls squarely within § 2-103 of the Act by alleging the Park District failed to enforce the IHRA, and should thus be dismissed against the Park District. *See Reyes v. Bd. of Educ. v. City of Chi.*, 139 N.E.3d 123, 137 (Ill. App. 2019) (granting immunity where plaintiff alleged that defendant failed to enforce Abused and Neglected Child Reporting Act); *Anthony v. City of Chi.*, 888 N.E.2d 721 (Ill. App. 2008) (granting immunity where the city sought an order to close a nightclub but then did not enforce it; because the complaint alleged the city did nothing at the time of the injury, § 2-103 applied). The Park District is likewise protected by § 2-104, which provides immunity for injuries "caused by the . . . failure or refusal to issue, deny, suspend or revoke, any permit, license . . . or similar authorization," including the Management Contract Plaintiffs assert the Park District should have canceled. 745 ILCS 10/2-104.

Count Two, alleging Defendants conspired with Mexico's fans to violate the Illinois Hate Crimes Act ("IHCA") likewise falls within the ambit of § 2-103 of the Act for

failing to prevent the injuries Plaintiffs sustained. Section 2-103 applies when a public entity is accused of passive non-enforcement, and even applies when the public entity "took action at some earlier time, but failed to act at all when the injury occurred." *Reyes*, 139 N.E.3d at 137. Here, Plaintiffs allege the Park District conspired with Mexico's fans by not preventing them from using offensive chants at the Gold Cup Final, and that such conduct was a violation of the IHCA. Turning such "allegations concerning the [Park District's] failure to act into a course of direct action is not persuasive," and warrants dismissal for falling within the immunity afforded the Park District by § 2-103. *Anthony v. City of Chicago,* 888 N.E.2d 721, 730 (Ill. App. 2008).

## CONCLUSION

Defendants respectfully request that Count Two be dismissed with prejudice against Defendants pursuant to Fed. R. Civ. P. 12(b)(6) because Plaintiffs have not alleged sufficient facts to show an intentional agreement between the alleged conspirators, and that Counts One and Two likewise be dismissed with prejudice against the Park District because it is protected by the Illinois Tort Immunity Act.

Date: October 27, 2021

Respectfully submitted,

/s/ Christopher Ward
Christopher Ward
Foley & Lardner LLP
321 North Clark Street, Suite 3000
Chicago, IL 60654-4762
cward@foley.com
312.832.4500
312.832.4700 (facsimile)

*Attorneys for Defendants SMG d/b/a ASM Global and the Chicago Park District*

## <u>CERTIFICATE OF SERVICE</u>

I, Christopher Ward, an attorney, hereby certify that on October 27, 2021, I caused the foregoing BRIEF IN SUPPORT OF MOTION TO DISMISS to be served on the following parties, by electronic mail and by First Class U.S. mail, postage prepaid, properly addressed to:

Mark A. Flessner
300 S. Wacker Drive, Suite 1500
Chicago, Illinois 60606
Mark.Flessner@sfbbg.com

/s/ Christopher Ward
Christopher Ward
