## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JORDAN PENLAND, KARL GERNER, EDWARD R. BURKE, and PAUL C. BURKE, | ) ) ) | |
| | ) | Case No. 1:21-cv-05581 |
| Plaintiffs, | ) | |
| v. | ) | Hon. John Robert Blakey |
| | ) | |
| CHICAGO PARK DISTRICT, SOLDIER FIELD, and ASM GLOBAL, | ) ) | Magistrate Judge Sheila M. Finnegan |
| | ) | |
| Defendants. | ) | |
| | ) ) | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Defendants Chicago Park District, Soldier Field, and ASM Global have (a) violated their duty to host an event at a place of public accommodation free of discrimination based on sexual orientation under the Illinois Human Rights Act, and (b) conspired to unlawfully fail to provide a place of public accommodation free of discrimination based on sexual orientation under the Illinois Human Rights Act. Among the victims of these actions are Plaintiffs Jordan Penland, Karl Gerner, Edward R. Burke, and Paul C. Burke, who, by and through their counsel, Winston & Strawn LLP, now file the following First Amended Complaint to enforce their individual rights:

## INTRODUCTION

The Chicago Park District, Soldier Field, and its management company surely would never tolerate or allow thousands of fans in a sold-out stadium to bellow the "N-word" so loudly that it could be heard on a national television broadcast. Yet, Defendants tolerated such discrimination when it targeted LGBTQ+ patrons by taking no action in response to fans of the Mexico national soccer team bellowing an anti-gay slur at least 28 times during the 2019 CONCACAF Gold Cup Final, which took place at Soldier Field in Chicago, Illinois. This tolerance of sexual orientation

discrimination is wrong both morally and under the law. That is why Chicago Park District, Soldier Field, and its management company violated the Illinois Human Rights Act by denying LGBTQ+ patrons such as U.S. Navy Lt. Commander Jordan Penland, his husband, and the other Plaintiffs the full and equal enjoyment of Soldier Field during the 2019 CONCACAF Gold Cup Final on July 7, 2019—the culmination of a preeminent international soccer tournament governed by the Confederation of North, Central America and Caribbean Association Football (CONCACAF) and played between teams from nations located in North America, Central America, and the Caribbean.

The 2019 Gold Cup tournament consisted of 16 teams with a group stage and a single-elimination tournament. The entire 2019 Gold Cup was held in stadiums across the United States, but the only match hosted by Solider Field was the most important match, the Gold Cup Final, with the tournament championship at stake before an international broadcast audience. To host this match, Defendants entered into contracts that addressed issues related to hosting a major sporting event, such as the right to use Soldier Field, the division of the revenue from the match, and most importantly to this case, the policies and procedures to keep fans safe. That is why conversations between Defendants about the policies and procedures regarding fan safety, including potential discriminatory behavior, must have taken place during contractual negotiations. And one specific behavior by Mexico soccer fans that had been vexing the soccer community for the better part of a decade should have been a particularly evident topic of discussion during these contractual negotiations.

For roughly the past decade, Mexico soccer fans attending soccer matches have chanted—with increasing volume and frequency—a homophobic slur, "¡eeeh puto!," which is a vulgar term for a male sex worker (the "Discriminatory Chant").,. The Discriminatory Chant has been so

pervasive and so loud over the years that it has been heard on the broadcast of Mexico matches, which even led to ESPN and Univision issuing disclaimers on the air for this sexual orientation discrimination during the 2014 FIFA World Cup. Mexico soccer fans' use of the Discriminatory Chant intensified during the qualifying stages of the 2018 World Cup. In fact, Fédération Internationale de Football Association (FIFA), the world-wide soccer regulatory body that has branded this chant as discriminatory, fined the Federación Mexicana de Fútbol Asociación (Mexican Football Federation) at least 12 times in 2017 alone for Mexico soccer fans' usage of the Discriminatory Chant. But the Discriminatory Chant continued.

The Mexico soccer fans continued to use the Discriminatory Chant throughout the 2019 Gold Cup, including all five Mexico matches leading up to the Gold Cup Final. This led one soccer journalist to write, on the day before the Gold Cup Final, that "the [Discriminatory Chant] has been heard loud and proud where El Tri has gone this summer, from the Rose Bowl in Pasadena, California, to the Bank of America Stadium in Charlotte, North Carolina." He was not alone in this recognition. CONCACAF made a statement prior to the Gold Cup Final that the Discriminatory Chant "has no place in football and must be stopped." Yet, no one with the power to stop it, did so.

So, the Discriminatory Chant used by Mexico soccer fans had been recognized as a problem by the broadcast networks, FIFA, CONCACAF, and others within the soccer community for years preceding, and on the days leading up to, the 2019 Gold Cup Final. In fact, in an Illinois Department of Human Rights (IDHR) proceeding, Defendants admitted that Mexico soccer fans screaming the Discriminatory Chant was "common knowledge." That is why Defendants Chicago Park District, Soldier Field, and its management company, as well as CONCACAF and the Mexican Football Federation, should have had ample knowledge that the Discriminatory Chant

would almost certainly be used by Mexico soccer fans during the 2019 Gold Cup Final. But even if these Defendants, CONCACAF, and the Mexican Football Federation had stuck their heads in the sand for the better part of a decade (and on information and belief, they did not), Plaintiffs informed Defendants prior to the Gold Cup Final that this Discriminatory Chant would likely occur. Plaintiffs asked Defendants to intervene to ensure that Soldier Field—the stadium that Defendants controlled through title or contract—would be free of sex-based discrimination, free of a Discriminatory Chant that screams at LGBTQ+ patrons that their sexual orientation makes them less masculine, a less worthy participant in sporting events, and a less worthy person.

On Sunday, July 7, 2019, Plaintiffs, dressed in their officially licensed U.S. Soccer jerseys with rainbow-colored numbers to cheer on the United States Men's National Team (USMNT), entered Soldier Field with 62,493 other people, predominantly consisting of Mexico soccer fans. And the predictable happened. More than 28 times during this international soccer match, LGBTQ+ fans like Lt. Commander Penland and the other Plaintiffs were repeatedly subjected to the Discriminatory Chant by Mexico soccer fans. Like the prior instances, the use of the Discriminatory Chant was so pervasive and so loud that it could be heard on a broadcast of the match at least 28 separate times. That meant that instead of being able to cheer on the USMNT like other fans at Soldier Field, Plaintiffs' dignity, identity, and sense of belonging was attacked, repeatedly, while merely trying to enjoy attending a soccer match. And instead of being able to use the facility like other fans at Soldier Field, Plaintiffs had to grapple with whether harmful, threatening words would transform into harmful, threatening physical violence.

Prior to the filing of this lawsuit, the IDHR investigated the Defendants' actions leading up to and during the 2019 Gold Cup Final. The IDHR concluded that, just as Black individuals at a public sporting event should not be subjected to repeated chants of the N-word, LGBTQ+ patrons

4

like Lt. Commander Penland and the other Plaintiffs should not have been repeatedly subjected to chants of a gay slur at Soldier Field.  The IDHR also noted that "the services offered by an agent of an owner are the equivalent of the [] services being offered by the owner," because the word "operator" under the Illinois Human Rights Act means "any owner, lessee, proprietor, manager, superintendent, agent, or occupant of a place of public accommodation."  As a result, Defendants could not shirk legal responsibility by blaming other agents for the 28 instances of the Discriminatory Chant that occurred during the Gold Cup Final.  This led the IDHR to find substantial evidence that the Chicago Park District, Soldier Field, and its management company violated the Illinois Human Rights Act ("Human Rights Act," "IHRA," or "Act") by denying LGBTQ+ patrons such as Plaintiffs the full and equal enjoyment of Soldier Field during the 2019 Gold Cup Final.

This lawsuit seeks to enforce the Illinois Human Rights Act, to establish the principle that stadiums and other public accommodations in Illinois have a legal duty to protect LGBTQ+ patrons from anti-gay slurs during sports events held at public facilities in Illinois—or in other words, that LGBTQ+ fans have a legal right to enjoy sporting events in Illinois free of sexual orientation discrimination.

## **PARTIES**

1.     Plaintiff Jordan T. Penland ("Lt. Commander Penland" or "LCDR Penland") is a Lieutenant Commander in the United States Navy and is currently stationed by order in Cairo, Egypt.  LCDR Penland resides in Seattle, Washington.

2.     Plaintiff Karl E. Gerner ("Gerner") resides in Seattle, Washington.  Gerner is married to Lt. Commander Penland.

3.     Plaintiff Edward R. Burke ("Edward Burke") resides in Boise, Idaho.

4.     Plaintiff Paul C. Burke ("Paul Burke") resides in Salt Lake City, Utah.

5.     Plaintiffs LCDR Penland, Karl Gerner, and Paul C. Burke are gay men entitled to protection against discrimination based on sexual orientation at places of public accommodation in Illinois.

6.     Defendant Chicago Park District ("Park District" or "CPD") is a body politic and corporate that, pursuant to Illinois law, may sue and be sued, contract and be contracted with, and acquire and hold real property necessary for its corporate purposes.

7.     Chicago Park District is an owner and operator of Soldier Field within the meaning of the Illinois Human Rights Act.

8.     Defendant Soldier Field is a stadium owned by the Chicago Park District.

9.     Soldier Field is a place of public accommodation within the meaning of the Illinois Human Rights Act.

10.     Defendant ASM Global is a global facility management and venue services company that operates and manages Soldier Field pursuant to a contract between the Chicago Park District and SMG, a predecessor of ASM Global.  ASM Global has its headquarters in Los Angeles, California.

11.     ASM Global is an operator of Soldier Field within the meaning of the Illinois Human Rights Act.

**JURISDICTION AND VENUE**

12.     Defendants removed this action arising from Section 10-102(A)(1) of the Human Rights Act, which provides that "[a]n aggrieved party may commence a civil action in an appropriate Circuit Court," that was originally filed in Illinois state court to federal court, so this Court possesses subject-matter jurisdiction over this action based on diversity of citizenship and an amount in controversy exceeding $75,000 under 28 U.S.C. § 1332(a).

13.     This Court has personal jurisdiction over Defendants pursuant to due process, because Defendants had sufficient minimum contacts in Illinois by either residing in Illinois, committing acts in Illinois that this lawsuit arises from, or continuing to do business within Illinois.

14.     Venue for this action in this Court is proper under 28 U.S.C. § 1391, because Defendants either reside in the Northern District of Illinois or significant events giving rise to this action occurred in the Northern District of Illinois.

## FACTUAL BACKGROUND

15.     On July 7, 2019, Soldier Field hosted the 2019 CONCACAF Gold Cup Final ("Gold Cup Final"), the final match of an international soccer tournament that featured the United States and Mexico national soccer teams.

16.     Approximately 62,493 fans attended the Gold Cup Final at Soldier Field on July 7, 2019, which is more than the official capacity of Solider Field (61,500 persons).

17.     Mexico soccer fans vastly outnumbered United States soccer fans at the Gold Cup Final at Soldier Field on July 7, 2019, and according to one account of the match (*see* Exhibit A), Mexico soccer fans comprised roughly 85% of the attendance at Soldier Field.

18.     At the 2019 Gold Cup Final, Mexico soccer fans chanted at least 28 times—each loud enough to be picked up on the official CONCACAF broadcast of the match—the Discriminatory Chant.  *See* Exhibit B.

19.     The Discriminatory Chant is a homophobic slur,"¡eeeh puto!," which is a vulgar term for a male sex worker.

20.     Dictionary.com acknowledges that "puto" "like the English gay or [f-word] … can demean a man as cowardly due to homophobic stereotypes of gay men." *See* Exhibit C.

21.     The International Court of Arbitration for Sport has determined that the Discriminatory Chant is insulting.  *See* Exhibit D.

22.     FIFA has determined that the Discriminatory Chant is homophobic. *See* Exhibit E.

23.     The sheer frequency of the Mexico soccer fans' use of the Discriminatory Chant averaged a Discriminatory Chant every 3-minutes-and-12-seconds of the 90-minute soccer match.

**The Decades-Long History of the Discriminatory Chant Put Defendants on Notice About**
**Foreseeable Sex-Based Discrimination that Would Occur During the 2019 Gold Cup Final**

24.     For almost a decade, the press has reported about Mexico soccer fans' usage of the Discriminatory Chant at soccer matches, including but not limited to the following news articles:

- **June 18, 2014:** London Telegraph, "World Cup 2014: Brazil and Mexico face action for 'homophobic' chanting by fans," https://www.telegraph.co.uk/sport/football/world-cup/10910538/World-Cup-2014-Brazil-and-Mexico-face-action-for-homophobic-chanting-by-fans.html. *See* Exhibit F.

- **June 23, 2014:** NPR, "Some Mexico Fans Feel Unfairly Targeted for World Cup Chants," https://www.npr.org/sections/codeswitch/2014/06/23/324629058/some-mexico-fans-feel-unfairly-targeted-for-world-cup-chants. *See* Exhibit G.

- **June 24, 2014:** Slate, "What's the Puto Problem?," https://slate.com/human-interest/2014/06/puto-world-cup-what-does-mexicos-anti-gay-world-cup-soccer-chant-really-mean.html. *See* Exhibit H.

- **July 13, 2015:** Outsports, "Mexican Soccer Fan Explains Why 'Puto' is a gay slur," https://www.outsports.com/2015/7/13/8942841/mexico-guatemala-concacaf-gold-cuo-soccer-puto-gay-slur. *See* Exhibit I.

- **January 13, 2016:** The Guardian, "Chile, Argentina, Mexico, Uruguay and Perdu fined over homophobic chants," https://www.theguardian.com/football/2016/jan/13/argentina-chile-mexico-peru-uruguay-fined-fans-homophobic-chants. *See* Exhibit J.

- **June 17, 2016:** The New York Times, "In Wake of Orlando Shootings, Mexican Soccer Chant Offends Many," https://www.nytimes.com/2016/06/18/sports/in-wake-of-orlando-shootings-mexican-soccer-chant-offends-many.html. *See* Exhibit K.

- **June 21, 2016:** The Washington Post, "Mexican Soccer Fans Need to Stop this Homophobic Chant," https://www.washingtonpost.com/posteverything/wp/2016/06/21/mexican-soccer-fans-need-to-stop-this-homophobic-chant/. *See* Exhibit L.

- **October 5, 2016:** NBC Sports, "Mexico to appeal latest fine by FIFA over anti-gay chant" (Oct. 5, 2016), https://soccer.nbcsports.com/2016/10/05/mexico-to-appeal-latest-fine-by-fifa-over-anti-gay-chant/. *See* Exhibit M.

- **May 1, 2017:** Outsports, "Mexico soccer again fined by FIFA for anti-gay 'puto' chant" (May 1, 2017), https://www.outsports.com/2017/5/1/15502862/mexico-gay-puto-chant-fine. *See* Exhibit N.

- **June 20, 2017:** CBS Sports, "Confederations Cup: FIFA issues warning to Mexico over fans' homophobic chants" (June 20, 2017), https://www.cbssports.com/soccer/news/confederations-cup-fifa-issues-warning-to-mexico-over-fans-homophobic-chants/. *See* Exhibit O.

- **June 21, 2017:** The Washington Post, "Mexican Soccer Federation Begs Fans to Stop Homophobic Chants at Games," https://www.washingtonpost.com/news/early-lead/wp/2017/06/21/mexican-soccer-federation-begs-fans-to-stop-homophobic-chant-at-games. *See* Exhibit P.

- **July 5, 2017:** Sports Illustrated, "CONCACAF takes measures to eradicate anti-gay fan chant at Gold Cup – and beyond" (July 5, 2017), https://www.si.com/soccer/2017/07/06/gold-cup-mexico-anti-gay-puto-fan-chant-concacaf-plan. *See* Exhibit Q.

- **October 5, 2017:** Outsports, "FIFA cited 51 instances of anti-gay chants, fined 16 countries" (Oct. 5, 2017), https://www.outsports.com/2017/10/5/16434762/fifa-gay-fine-gay-world-cup. *See* Exhibit R.

- **June 18, 2018:** The Guardian, "'Homophobic and Not Very Clever': Why Puto Chants Haunt Mexican Football," https://www.theguardian.com/football/2018/jun/18/puto-chants-mexico-football-world-cup. *See* Exhibit S.

- **June 20, 2018:** Bleacher Report, "Mexico Federation Fined $10K for 'Discriminatory' Chants vs Germany in World Cup," https://bleacherreport.com/articles/2782138-mexico-federation-fined-10k-for-discriminatory-chants-vs-germany-in-world-cup. *See* Exhibit T.

- **June 21, 2018:** The New York Times, "Fined by FIFA, Mexico Tries, Again, to Banish a Homophobic Chant by Its Fans," https://www.nytimes.com/2018/06/21/sports/world-cup/mexico-puto-chant.html. *See* Exhibit U.

- **June 18, 2019:** Yahoo! Sports, "Mexican soccer's homophobic chant is back, and so are the insufficient attempts to stop it" (June 18, 2019), https://sports.yahoo.com/mexican-fans-homophobic-chant-is-back-and-so-are-the-insufficient-attempts-to-stop-it-140418817.html. *See* Exhibit V.

- **July 5, 2019:** ESPN, "Mexico Fans Urged Again to Stop Anti-Gay Chant," https://www.espn.com/soccer/mexico/story/3893874/mexico-fans-urged-again-to-stop-anti-gay-chant. *See* Exhibit W.

25.     In the years preceding the 2019 Gold Cup, FIFA, the international governing body of soccer, has repeatedly fined and sanctioned the Mexican Football Federation for Mexico soccer fans' use of the Discriminatory Chant during matches, often when Mexico's opponent is taking a goal kick, including but not limited to the following fines by year:

- **2016:** The Mexican Football Federation was fined at least three times for Mexico soccer fans' use of the Discriminatory Chant at matches. *See* Exhibit M.

- **2017:** The Mexican Football Federation was fined at least 12 times for Mexico soccer fans' use of the Discriminatory Chant at World Cup qualifying matches. *See* Exhibits R, U.

- **2018:** The Mexican Football Federation was fined at least one time (out of four total World Cup matches) for Mexico soccer fans' use of the Discriminatory Chant at World Cup matches, and FIFA threatened participating Mexico Soccer fans with confiscation of their FanIDs, effectively banning the discriminatory fans from the World Cup. *See* Exhibit X.

26.     In the four Gold Cup tournaments and the CONCACAF Cup (a game between the winners of the 2013 and 2015 Gold Cup) held before 2019, Mexico soccer fans have used the Discriminatory Chant, including but not limited to the following incidents experienced by Plaintiffs themselves and videos evidencing this discriminatory behavior:

- **2011 Gold Cup:** Mexico soccer fans used the Discriminatory Chant during the United States versus Mexico soccer match on August 13, 2011, evidenced by a YouTube video. *See* Exhibit Y.

- **2013 Gold Cup:** Mexico soccer fans used the Discriminatory Chant during the Gold Cup Final between Mexico and Panama, evidenced by a YouTube video. *See* Exhibit Z.

- **2015 Gold Cup:** Mexico soccer fans used the Discriminatory Chant during the Gold Cup Final between Mexico and Jamaica, evidenced by a YouTube video. *See* Exhibit AA.

- **2015 CONCACAF Cup:** Plaintiffs Edward Burke and Paul Burke were assaulted at the Rose Bowl during the CONCACAF Cup between the United States and

Mexico after the Burkes objected to the use of the Discriminatory Chant by neighboring fans in the stands. CONCACAF apologized to the Burkes for the 2015 incident at the Rose Bowl, but CONCACAF failed to implement and enforce its own rules at subsequent events to stop subsequent occurrences of the Discriminatory Chant. In addition, this sex-based discrimination was documented in a YouTube video of the CONCACAF Cup between United States and Mexico. *See* Exhibit BB.

- **2017 Gold Cup:** Plaintiffs Karl Gerner and Paul Burke attended matches during the 2017 Gold Cup at which neither CONCACAF nor responsible officials at stadiums in San Diego and Pasadena, California acted to stop the Discriminatory Chant. *See* Exhibit DD. In addition, this sex-based discrimination was documented in YouTube video of a Gold Cup match between Mexico and El Salvador. *See* Exhibit CC.

27.    During the 2019 Gold Cup, Mexico soccer fans used the Discriminatory Chant at

***each and every Gold Cup match*** that Mexico played leading up to the Gold Cup Final, which was

reported in the national news media prior to the Gold Cup Final, including but not limited to the

following articles confirming the use of the Discriminatory Chant:

- Outsports, "Rose Bowl and Concacaf allow anti-gay chants throughout Mexico's Gold Cup match" (June 16, 2019), https://www.outsports.com/2019/6/16/18680824/gay-soccer-gold-cup-concacaf-match-rose-bowl. *See* Exhibit EE.

- Yahoo! Sports, "Mexican soccer's homophobic chant is back, and so are the insufficient attempts to stop it" (June 18, 2019), https://sports.yahoo.com/mexican-fans-homophobic-chant-is-back-and-so-are-the-insufficient-attempts-to-stop-it-140418817.html. *See* Exhibit V.

- ESPN, "Mexico fans urged again to stop anti-gay chant" (July 5, 2019), https://www.espn.com/soccer/mexico/story/3893874/mexico-fans-urged-again-to-stop-anti-gay-chant?platform=amp&__twitter_impression=true. *See* Exhibit W.

- The 18, "Mexico Fans Are Still Using Anti-Gay Chant And They Probably Don't Even Care" (July 6, 2019), https://the18.com/en/soccer-news/mexico-anti-gay-chant-gold-cup-2019. *See* Exhibit FF.

28.    For at least these reasons, Defendants knew, or should have known, that it was

predictable and foreseeable that Mexico soccer fans would attempt to use the Discriminatory Chant

during the 2019 Gold Cup Final at Soldier Field.

**Defendants Agreed to Contracts that Allowed Solider Field to Host the 2019 Gold Cup Final that Included Provisions About Fan Safety and Adhering to Illinois State Law**

29. Defendants executed at least two contracts—each of which, based on information and belief, would have required conversations, negotiations, and agreements between sophisticated entities about the provisions in those contracts—to legally allow the 2019 Gold Cup Final to be hosted at Soldier Field.

30. *First*, Chicago Park District and ASM Global negotiated, entered into, and executed the Management Contract establishing ASM Global as an agent that can enter into contracts regarding events at Soldier Field. *See* Exhibit GG.

31. The Management Contract specifically has a section (Section 3.4) titled, "Scope of Services – Security and Crowd Management." And the Management Contract has several provisions that required the Defendants to: (a) provide security and crowd management services; (b) make and develop security and crowd management plans; (c) update security and crowd management plans; and (d) communicate with one another "on a regular basis" about preventative and proactive security procedures. These provisions include, but are not limited to, the following:

- Section 3.4(A) states that, in general, "[ASM Global] shall be responsible for security, crowd management, and medical services at the Sports Facilities [including Soldier Field] and for the customers, employees, visitors, and users of the Sports Facilities [including Soldier Field] 24 hours a day, seven (7) days a week."

- Section 3.4(B)(7) of the Management Contract also provides that "[ASM Global] shall consult with the City … on security, crowd management and medical services issues on a regular basis and implement preventative and proactive security and medical services procedures."

- Section 3.4(B)(9) of the Management Contract states that "[ASM Global] shall develop and maintain a Public Safety and Fire Management Plan for the Solider Field Complex and the parts thereof in compliance with Applicable law."

32.     In addition, the Management Contract Section 19 has the following two provisions concerning anti-discrimination and compliance with laws:

- Section 19.2 (Anti-Discrimination) of the Management Contract states that "[ASM Global] shall not discriminate on the basis of ... sexual orientation with respect to … providing services under this Agreement…."; and

- Section 19.28 (Compliance) of the Management Contract provides that ASM Global "must comply with all federal, state, county, and municipal laws, statutes, ordinances and executive orders in effect now or later and whether or not they appear in this Agreement."

33.     The Management Contract thus required ASM Global to comply with federal and state laws, including the Illinois Human Rights Act.  And both the Human Rights Act and the Management Contract required Defendants and/or other parties to the contract to provide LGBTQ+ fans with full, equal, and safe enjoyment of any event held at Soldier Field, including the Gold Cup Final.

34.     On information and belief, Chicago Park District and ASM Global are two sophisticated entities that entered into a Management Contract concerning one of the 32 NFL stadiums in the United States that had an entire section focused on "Security and Crowd Management," which contractually required developing, updating, and discussing on "a regular basis" security and crowd management plans, as well as a second section that discussed "Anti-Discrimination" and "Compliance" with state laws; therefore, Chicago Park District and ASM

Global must have discussed and agreed about the provisions regarding security and crowd management requirements at Soldier Field, including security and anti-discrimination issues pertaining to LGBTQ+ patrons.

35.     Based on inferences from above and on information and belief, Chicago Park District and ASM Global agreed to host an event without taking reasonable and appropriate steps to prevent predictable and foreseeable sexual orientation discrimination, as required under state law.

36.     As a result of this agreement and unlawful conduct, Chicago Park District and ASM Global violated the Illinois Human Rights Act.

37.     *Second,* Soldier Field and/or its management company entered into an Event Contract with CONCACAF that allowed the Gold Cup Final to be hosted by Soldier Field. *See* Exhibit HH (discussing the Event Contract within IDHR Charge No. 2476).

38.     On information and belief, the Event Contract had sections and/or provisions that governed security and crowd management responsibilities, as well as compliance and adherence to federal, state, and local laws.

39.     On information and belief, Soldier Field and/or its management company and CONCACAF are sophisticated entities which negotiated and entered into an Event Contract concerning hosting the final soccer match of the preeminent international soccer tournament in the North and Central America,  including security and crowd management responsibilities and compliance to federal, state, and local law provisions; therefore, Soldier Field and/or its management company and CONCACAF must have discussed and agreed about the provisions regarding security and crowd management requirements at Soldier Field, including security and anti-discrimination issues pertaining to LGBTQ+ patrons.

40.     The Event Contract, on information and belief, thus required CONCACAF to comply with federal and state laws, including the Illinois Human Rights Act.  And both the Human Rights Act and the Event Contract required Defendants and/or other parties to the contract to provide LGBTQ+ fans with full, equal, and safe enjoyment of any event held at Soldier Field, including the Gold Cup Final.

41.     In addition, Soldier Field and/or its management company, through the Event Contract, granted CONCACAF control of the public announcement system and video boards during the Gold Cup Final, including the following provision:

> Stadium Manager guarantees Licensee exclusive use of Stadium during the Exclusive Period, including but not limited to all … public announcement system ("PA system", video boards, scoreboards, LED boards, ribbon boards, in-house TV monitors, electronic messaging displays, etc., for any/all sponsorship and operational needs[.]

42.     By  granting CONCACAF exclusive rights to the PA system and electronic messaging displays, Soldier Field and/or its management company left a potential crowd management strategy, the Three-Step Match Protocol (discussed *infra*), exclusively in CONCACAF's control, despite the fact that Soldier Field and/or its management company knew, or should have known, before entering into the Event Contract that CONCACAF previously:

- Had numerous CONCACAF-sponsored events where the Discriminatory Chant occurred during the previous five years, including during the 2015 and 2017 Gold Cups;

- Had never before enforced its own rules prohibiting the Discriminatory Chant; and

- Had developed the Three-Step Match Protocol in 2014 to combat racism and sexual orientation discrimination by stopping the match and issuing warnings to the fans via the PA system and message boards (*see* Exhibit II) but ***had never*** implemented

this protocol for addressing discrimination. *See* Exhibit FF (discussing right before the 2019 Gold Cup Final how CONCACAF had never implemented the Three Step Protocol).

43.     Moreover, Soldier Field and/or its management company agreed to contractually allow CONCACAF exclusive control the PA system and scoreboard at Soldier Field in spite of the fact that CONCACAF has a sordid, untrustworthy history that includes criminal charges filed by the U.S. Department of Justice against several CONCACAF officials in 2015.

44.     On information and belief, given the common knowledge of the Discriminatory Chant by Mexico soccer fans at matches and CONCACAF's exclusive solution through the Three-Step Match Protocol, Soldier Field and/or its management company must have discussed with CONCACAF when contractually granting CONCACAF the exclusive control over the PA system and messaging boards the implementation of the Three-Step Match Protocol or some method of crowd management to prevent sex-based discrimination against LGBTQ+ patrons during the 2019 Gold Cup Final.

45.     Soldier Field and/or its management company and CONCACAF agreed to host an event without taking reasonable and appropriate steps, including but not limited to implementing the Three-Step Match Protocol, to prevent or stop predictable and foreseeable sexual orientation discrimination, as required under state law.

46.     As a result of this agreement and unlawful conduct, Soldier Field and/or its management company and CONCACAF violated the Illinois Human Rights Act.

**Plaintiffs Provide Defendants Additional Notice About the Predictable and Foreseeable Usage of the Discriminatory Chant**

47.     On July 3, 2019, four days before the Gold Cup Final, Paul Burke sent an electronic mail message to Soldier Field's management, seeking assurances that responsible officials at

Soldier Field intended to comply with the Illinois Human Rights Act by providing LGBTQ+ patrons with full and equal enjoyment of the event.

48.     On July 3, 2019, Paul Burke wrote the following email addressed to Soldier Field's Assistant General Manager, Kevin Walsh (kwalsh@soldierfield.net):

> I hold tickets and have plans to attend the Gold Cup Final match this coming Sunday at Soldier Field. I am writing to seek assurances for my safety and dignity at this event. I also seek written assurances that LGBT fans will be afforded full and equal enjoyment of the event in compliance with the Illinois Human Rights Act ("Human Rights Act" or "Act").
>
> The Illinois' Human Rights Act states that "It is a civil rights violation for any person on the basis of unlawful discrimination to: (A) [d]eny or refuse to another the full and equal enjoyment of the facilities, goods, and services of any public place of accommodation." According to the Human Rights Act, "'Unlawful discrimination' means discrimination against a person because of his or her race, color, religion, national origin, ancestry, age, sex, marital status, order of protection status, disability, military status, sexual orientation, pregnancy, or unfavorable discharge from military service." The Act's definition of a "Place of public accommodation" includes every "motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment; [and …] auditorium, convention center, lecture hall or other place of public gathering."
>
> Soldier Field is a place of accommodation within the meaning of the Act, which offers express protection to LGBT citizens against unlawful discrimination on the basis of sexual orientation. It follows that LGBT fans are legally entitled to full, equal, and safe enjoyment of any event held at Soldier Field.
>
> It is foreseeable and should be expected that tens of thousands of fans will attempt to participate in homophobic chants at the Gold Cup Final on Sunday at Soldier Field. LGBT fans will not have full, equal, and safe enjoyment of the Gold Cup Final if only LGBT persons are subjected to thunderous chants by thousands of people of a slur based on sexual orientation.
>
> The CONCACAF Gold Cup ("Gold Cup") is sponsored by the Confederation of North, Central American and Caribbean Association Football ("CONCACAF"), which unfortunately has both an extensive and recent history of sponsoring matches that have been marred by large-scale fan misconduct. Over the last decade, the fans of several teams—most notably, the national team of Mexico—have engaged in mass chants of a homophobic slur—"¡eeeh puto!," which is a vulgar term for a male

prostitute—that has been predictably screamed when an opponent's goalkeeper prepares to take a goal-kick.

The Puto chant has been a scourge to international soccer over the last decade, but it has been prevented and stopped at other events through the use of best practices. For example, during the 2017 Confederations Cup and the 2018 World Cup, the Fédération Internationale de Football Association ("FIFA") successfully deterred fans from engaging in such misconduct. In advance of these tournaments, FIFA conducted educational campaigns that specifically addressed the Puto chant; announced a match protocol for stadium announcements and match suspensions in the event of discriminatory chants; and advised fans that their misconduct could cause their team to suffer from sanctions or even disqualification. FIFA recently issued a circular to its members that formally adopted these procedures for matches during qualifying tournaments for the 2022 World Cup.

Unfortunately, during the 2019 Gold Cup, CONCACAF has taken none of the steps that have been proven effective to combat large-scale homophobic chants by fans. CONCACAF has not contacted ticket buyers or conducted any public education to specifically condemn the Puto chant. During matches thus far during the tournament, CONCACAF has failed to implement its own match protocol for racist and discriminatory events to address pervasive fan misconduct. Homophobic chants have repeatedly thundered through stadiums in Pasadena, California; Denver, Colorado; Charlotte, North Carolina; Houston, Texas; and Phoenix, Arizona during the 2019 Gold Cup tournament without response from CONCACAF, its match commissioners, or any stadium officials. CONCACAF has also failed during the 2019 Gold Cup competition to sanction any team whose fans have engaged in widespread misconduct. As a result, CONCACAF has failed to align the competitive interests of fans to encourage compliance with applicable codes of fan conduct.

Given CONCACAF's persistent failures to prevent and stop homophobic and discriminatory fan misconduct both during the 2019 Gold Cup and at CONCACAF-sponsored events over the last decade, the Chicago Park District ("CPD") and Soldier Field have reason to review their contractual agreements with the promoters and sponsors of the Gold Cup. I encourage you to conduct due diligence by reviewing telecasts from recent matches involving Mexico during the 2019 Gold Cup, including last night's semifinal match against Haiti.

I presume that CPD and Soldier Field would not proceed to host an event if it was reasonably expected that tens of thousands of attendees would repeatedly and uncontrollably engage in racist behavior. It is also hard to imagine that CPD and Soldier Field would allow chants of a racial slur to echo through their facilities without any sanction. Gay slurs are no less

worthy of prevention and condemnation. Anti-gay behavior should be addressed with the same seriousness and severity as racist misconduct.

Assuming that Soldier Field moves forward to host the Gold Cup Final on Sunday, I hope that Soldier Field, the Chicago Park District, and the City of Chicago will make all necessary preparations to fully control the crowd and to promptly stop homophobic fan misconduct, presumably by implementing internationally recognized match protocols by making public announcements and suspending play in order to gain control over fan conduct. If CPD and Soldier Field cannot enforce the facility's Code of Conduct and protect all fans—including LGBT fans—from abuse during the Gold Cup Final, then Sunday's match should either be cancelled, played without spectators, or postponed until all fans can have full, equal, and safe access to the match.

Please provide me with written assurances that CPD and Soldier Field will comply with the Illinois Human Rights Act for the Gold Cup Final. I look forward to receiving prompt written assurances that I and all LGBT fans will receive full, equal, and safe enjoyment of Sunday's match.

Thank you for your prompt attention to these important matters.

Respectfully,
Paul C. Burke

49.     Plaintiff Paul Burke sent a similar warning on July 3, 2019 to Chicago Park District General Counsel Timothy M. King through the online portal at Chicago Park District's website.

50.     Soldier Field and its management company received the email sent by Paul Burke on July 3, 2019 to Kevin Walsh.

51.     Despite Paul Burke's express request, Soldier Field did not respond to his July 3, 2019 email, nor did Soldier Field furnish any assurance that it would comply with the Illinois Human Rights Act during the Gold Cup Final.

52.     Despite Paul Burke's express request, the Chicago Park District did not respond to his July 3, 2019 email, nor did the Park District furnish any assurance that it would comply with the Illinois Human Rights Act during the Gold Cup Final.

53. These notices by Plaintiff Paul Burke to Defendants about concerns that Mexico soccer fans would engage in sexual orientation discrimination is additional evidence, along with the decade's worth of reporting about the usage of the Discriminatory Chant by Mexico soccer fans, showing that Defendants knew, or should have known, that the Discriminatory Chant would occur during the 2019 Gold Cup Final.

54. On information and belief, the notices sent by Plaintiff Paul Burke on behalf of Plaintiffs to Defendants must have generated discussions, correspondence, and agreements between Defendants regarding the Discriminatory Chant.

55. On information and belief, the notices sent by Plaintiff Paul Burke on behalf of Plaintiffs to Defendants must have generated discussions, correspondence, and agreements between Defendants, other conspirators, and third parties regarding the Discriminatory Chant.

56. On information and belief, Defendants, who specialize in hosting large events and create systems that allow patrons of those events to reach out regarding safety concerns, must have had some conversations and reached agreements about the official response, or lack thereof, when the Discriminatory Chant would predictably and foreseeably occur during the Gold Cup Final.

57. Based on inferences from the facts above and on information and belief, after receipt of these notices to each Defendant from Plaintiff Paul Burke, Defendants conspired to host an event without taking reasonable and appropriate steps, including but not limited to not implementing the Three-Step Match Protocol, to prevent sexual orientation discrimination, as required under state law.

## Plaintiffs Travel to Chicago to Attend the Gold Cup Final

58. Plaintiffs bought and used tickets in Section 246, Row 2, Seats 3 through 6 to attend the Gold Cup Final at Soldier Field on July 7, 2019.

59.     Plaintiffs then spent money to travel to and around Chicago, as well as stay in hotel and other travel related expenses.

60.     Plaintiffs wore official U.S. National Team replica uniforms celebrating Pride Month to the Gold Cup Final.  This Pride clothing, which featured rainbow numbering on the back of each Plaintiff, enabled other attendees, as well as stadium officials, to identify and associate each Plaintiff with the LGBTQ+ community.

61.     Because Plaintiffs were sitting in the second row and often stood to cheer the United States team, hundreds of Mexico soccer fans sitting behind Plaintiffs in Section 246 and the adjacent Section 249 could see Plaintiffs wearing rainbow-colored numbers on their backs and could therefore identify and associate them with the LGBTQ+ community.

62.     Although the timing of the Discriminatory Chant was connected to events on the field, as discussed below, some fans near Plaintiffs took note of Plaintiff's Pride clothing and noticeable disdain and discomfort from hearing the Discriminatory Chant and thus appeared to direct the Discriminatory Chant toward Plaintiffs.

**Defendants Failed to Address or Stop the Discriminatory Chant During the First Half, in Violation of the Illinois Human Rights Act**

63.     The first Discriminatory Chant occurred right at the outset of the match, at or about the 0:33 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

64.     No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 0:33 minutes/seconds mark of the Gold Cup Final match.

65. No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred at approximately the 0:33 minutes/seconds mark of the Gold Cup Final match.

66. The Discriminatory Chant occurred at or about the 4:38 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match. *See* Exhibit B.

67. No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 4:38 minutes/seconds mark of the Gold Cup Final match.

68. No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred at approximately the 4:38 minutes/seconds mark of the Gold Cup Final match.

69. After this second occurrence of the Discriminatory Chant, Plaintiffs sought to report the misconduct by text to the security number published online in the Soldier Field facility guide.

70. In response to their plea for assistance to Soldier Field's published security number, Plaintiffs received the following responses, which included a "Double Bird Salute":



71.    On information and belief, Soldier Field's management company had changed the security number but failed to update the stadium's online guide.  This endangered the dignity and safety of LGBTQ+ fans, including Plaintiffs, during an event where Mexico soccer fans repeatedly and predictably chanted a homophobic slur.

72.    The Discriminatory Chant next occurred at or about the 5:54 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

73.    No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 5:54 minutes/seconds mark of the Gold Cup Final match.

74.    No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred at approximately the 5:54 minutes/seconds mark of the Gold Cup Final match.

75.    The Discriminatory Chant occurred at or about the 8:00 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

76.     No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 8:00 minutes/seconds mark of the Gold Cup Final match.

77.     No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred at approximately the 8:00 minutes/seconds mark of the Gold Cup Final match.

78.     The Discriminatory Chant occurred at or about the 10:42 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

79.     No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 10:42 minutes/seconds mark of the Gold Cup Final match.

80.     No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred at approximately the 10:42 minutes/seconds mark of the Gold Cup Final match.

81.     The Discriminatory Chant occurred at or about the 12:10 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

82.     No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 12:10 minutes/seconds mark of the Gold Cup Final match.

83.     No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred at approximately the 12:10 minutes/seconds mark of the Gold Cup Final match.

84. The Discriminatory Chant occurred at or about the 14:10 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match. *See* Exhibit B.

85. No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 14:10 minutes/seconds mark of the Gold Cup Final match.

86. No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred at approximately the 14:10 minutes/seconds mark of the Gold Cup Final match.

87. The Discriminatory Chant occurred at or about the 14:50 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match. *See* Exhibit B.

88. No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 14:50 minutes/seconds mark of the Gold Cup Final match.

89. No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred at approximately the 14:50 minutes/seconds mark of the Gold Cup Final match.

90. The Discriminatory Chant occurred at or about the 15:40 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match. *See* Exhibit B.

91. No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 15:40 minutes/seconds mark of the Gold Cup Final match.

92.     No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred approximately at the 15:40 minutes/seconds mark of the Gold Cup Final match.

93.     The Discriminatory Chant occurred at or about the 27:40 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

94.     No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 27:40 minutes/seconds mark of the Gold Cup Final match.

95.     No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred approximately at the 27:40 minutes/seconds mark of the Gold Cup Final match.

96.     The Discriminatory Chant occurred at or about the 29:29 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

97.     No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 29:29 minutes/seconds mark of the Gold Cup Final match.

98.     No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred approximately at the 29:29 minutes/seconds mark of the Gold Cup Final match.

99.     The Discriminatory Chant occurred at or about the 31:51 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

100.    No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 31:51 minutes/seconds mark of the Gold Cup Final match.

101.    No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred approximately at the 31:51 minutes/seconds mark of the Gold Cup Final match.

102.    The Discriminatory Chant occurred at or about the 36:25 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

103.    No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 36:25 minutes/seconds mark of the Gold Cup Final match.

104.    No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred approximately at the 36:25 minutes/seconds mark of the Gold Cup Final match.

105.    The Discriminatory Chant occurred at or about the 36:34 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

106.    No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 36:34 minutes/seconds mark of the Gold Cup Final match.

107.    No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred approximately at the 36:34 minutes/seconds mark of the Gold Cup Final match.

108.    The Discriminatory Chant occurred at or about the 38:10 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match. *See* Exhibit B.

109.    No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 38:10 minutes/seconds mark of the Gold Cup Final match.

110.    No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred approximately at the 38:10 minutes/seconds mark of the Gold Cup Final match.

111.    The Discriminatory Chant occurred at or about the 41:52 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match. *See* Exhibit B.

112.    No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 41:52 minutes/seconds mark of the Gold Cup Final match.

113.    No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred approximately at the 41:52 minutes/seconds mark of the Gold Cup Final match.

114.    The Discriminatory Chant occurred at or about the 43:40 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match. *See* Exhibit B.

115.    No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 43:40 minutes/seconds mark of the Gold Cup Final match.

116.    No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to Discriminatory Chant after it occurred approximately at the 43:40 minutes/seconds mark of the Gold Cup Final match.

**Plaintiffs Again Reach Out to Defendants to Stop the Discriminatory Chant and Defendants Took No Action to Stop the Discriminatory Chant in Violation of the Illinois Human Rights Act**

117.    During halftime of the match, Plaintiffs also complained about the Discriminatory Chant to stadium officials and a security guard stationed on the concourse above their seats.

118.    Both stadium officials dismissed Plaintiffs' complaints, expressing either (a) no understanding about the meaning of the Discriminatory Chant, or (b) no willingness to quell the sexual orientation discrimination out of fear of "angering" the Mexico soccer fans.

119.    One stadium official expressly stated that no one, including Defendants and/or other conspirators, had briefed him about the Discriminatory Chant.  This meant no one told this stadium official about: (a) predictable and foreseeable sexual orientation discrimination at the match; (b) the actions that would be implemented to combat this sexual orientation discrimination; and (c) the strategy to keep LGBTQ+ patrons safe in case harmful, threatening words transformed into harmful, threatening physical violence.

120.    Again, Plaintiffs' officially licensed U.S. Soccer Pride clothing also enabled officials at Soldier Field with whom Plaintiffs interacted before, during, and after the match to identify and associate them with the LGBTQ+ community.

121.    On information and belief, Defendants or others had trained personnel to respond to security concerns at the match and the personnel's lack of action regarding Plaintiffs' security concerns about at least 17 Discriminatory Chants that occurred during the first half at halftime reflected instructions or lack of instructions by Defendants regarding Defendants' official response to the Discriminatory Chant.  By contrast, on information and belief, if a fan had become unruly

for drinking too much, surely Defendants would have trained and instructed personnel to remove such an unruly fan from the stadium.

122.    In fact, Soldier Field's Code of Conduct states, in pertinent part:

>   Proper behavior is expected of all guests of Soldier Field. Unruly or inconsiderate behavior will not be tolerated and may be grounds for ejection from the stadium, revocation of ticket privileges, and subject to civil action and criminal action. Such behavior includes, but is not limited to: intoxication, profane, disruptive or abusive language or gestures, offensive or disorderly conduct, throwing objects, excessive standing in the seating area, smoking anywhere in the stadium, bringing any prohibited items into the stadium, entering or attempting to enter the field level or playing field. Guests who cannot conform their conduct to these rules are not welcome to Soldier Field.

123.    On information and belief, although the Discriminatory Chant violates Soldier Field's Code of Conduct, no action was taken during the Gold Cup Final by Soldier Field or its management company to enforce the Code of Conduct against any fan who participated in the Discriminatory Chant.

124.    Defendants and other conspirators' lack of enforcement of clear violations of the Code of Conduct—no ejections, no revocations, no civil actions, no criminal actions, no implementation of the Three-Step Protocol—demonstrated exactly what the Code of Conduct expressly professes against: Mexico soccer fans who engaged in discriminatory behavior were welcome at Soldier Field. Even more so, Defendants and other conspirators' lack of enforcement of clear violations of the Code of Conduct must represent an agreement to not enforce the Code of Conduct in violation of the Illinois Human Rights Act.

125.    The bottom line is that even though the Discriminatory Chant had occurred at least 17 times during the first half of the Gold Cup Final, no effective action was taken by any responsible official—who would have been under Defendants' control either directly or through

30

an agency relationship—during halftime to address or prevent the Discriminatory Chant from occurring during the second half.

**Defendants Failed to Address or Stop the Discriminatory Chant During the Second Half in Violation of the Illinois Human Rights Act**

126.    The Discriminatory Chant occurred at or about the 46:00 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

127.    No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 46:00 minutes/seconds mark of the Gold Cup Final match.

128.    No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred approximately at the 46:00 minutes/seconds mark of the Gold Cup Final match.

129.    The Discriminatory Chant occurred at or about the 52:22 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

130.    No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 52:22 minutes/seconds mark of the Gold Cup Final match.

131.    No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred approximately at the 52:22 minutes/seconds mark of the Gold Cup Final match.

132.    The Discriminatory Chant occurred at or about the 54:40 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

133.    No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 54:40 minutes/seconds mark of the Gold Cup Final match.

134.    No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred approximately at the 54:40 minutes/seconds mark of the Gold Cup Final match.

135.    The Discriminatory Chant occurred at or about the 54:43 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

136.    No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 54:43 minutes/seconds mark of the Gold Cup Final match.

137.    No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred approximately at the 54:43 minutes/seconds mark of the Gold Cup Final match.

138.    The Discriminatory Chant occurred at or about the 55:58 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

139.    No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 55:58 minutes/seconds mark of the Gold Cup Final match.

140.    No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred approximately at the 55:58 minutes/seconds mark of the Gold Cup Final match.

141.    The Discriminatory Chant occurred at or about the 57:11 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

142.    No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 57:11 minutes/seconds mark of the Gold Cup Final match.

143.    No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred approximately at the 57:11 minutes/seconds mark of the Gold Cup Final match.

144.    The Discriminatory Chant occurred at or about the 57:39 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

145.    No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 57:39 minutes/seconds mark of the Gold Cup Final match.

146.    No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred approximately at the 57:39 minutes/seconds mark of the Gold Cup Final match.

147.    The Discriminatory Chant occurred at or about the 58:56 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

148.    No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 58:56 minutes/seconds mark of the Gold Cup Final match.

149.     No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred approximately at the 58:56 minutes/seconds mark of the Gold Cup Final match.

150.     The Discriminatory Chant occurred at or about the 70:30 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

151.     No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 70:30 minutes/seconds mark of the Gold Cup Final match.

152.     No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred approximately at the 70:30 minutes/seconds mark of the Gold Cup Final match.

153.     The Discriminatory Chant occurred at or about the 82:38 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

154.     No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 82:38 minutes/seconds mark of the Gold Cup Final match.

155.     No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred approximately at the 82:38 minutes/seconds mark of the Gold Cup Final match.

156.     The Discriminatory Chant occurred at or about the 90:45 minutes/seconds mark of the Gold Cup Final match, which can be heard on a broadcast of the match.  *See* Exhibit B.

157.    No implementation of the Three-Step Match Protocol occurred by Defendants and/or other conspirators after the Discriminatory Chant occurred at approximately the 90:45 minutes/seconds mark of the Gold Cup Final match.

158.    No action, such as reprimanding, removing, or citing discriminatory fans, was taken by Defendants and/or other conspirators to stop the Discriminatory Chant after it occurred approximately at the 90:45 minutes/seconds mark of the Gold Cup Final match.

**Summary of Discriminatory Chants During Gold Cup Final that Defendants Took No Action to Stop in Violation of the Illinois Human Rights Act**

159.    The Discriminatory Chant occurred at least 28 times during the Gold Cup Final match at Soldier Field.

160.    The Three-Step Match Protocol was never implemented by Defendants and/or other conspirators during the Gold Cup Final match at Soldier Field.

161.    No action was taken at any time by any responsible official employed by or as an agent of Defendants and/or other conspirators at Soldier Field to stop the Discriminatory Chant after it occurred, even though it occurred at least 28 times during the Gold Cup Final match.

162.    Specifically, the Management Contract requires ASM Global to have a least one representative present at every event at Soldier Field.

163.    On information and belief, at least one representative of ASM Global was present at Soldier Field during the Gold Cup Final.

164.    No official of ASM Global present at the Gold Cup Final took any action in response to the Discriminatory Chants to address or stop the Discriminatory Chants.

165.    On information and belief, fans have been ejected or otherwise disciplined at other sporting events at Soldier Field for violating the Code of Conduct by engaging in offensive or disorderly conduct, including the use of racial slurs.

166.    On information and belief, fans have been ejected from other sporting events at Soldier Field for using racial slurs and have been cited and/or prosecuted for disorderly conduct, but no fan who attended the Gold Cup Final was ejected or discipled for participating in the Discriminatory Chant.

167.    No fan who attended the Gold Cup Final was cited, charged, or prosecuted for disorderly conduct for having participated in the Discriminatory Chant.

168.    The lack of action documented above reflects a simple fact: Defendants and/or conspirators did nothing—nothing in the moment, nothing after the fact— to stop or deter the Discriminatory Chant after each and every instance it occurred at the 2019 Gold Cup Final, which occurred roughly every 3-minutes-and-12-seconds of match play.

169.    The lack of action documented above reflects, on information and belief, a simple agreement: Defendants and/or conspirators agreed to host the 2019 Gold Cup Final without taking reasonable and appropriate steps to prevent or stop predictable and foreseeable sexual orientation discrimination, as required under state law.

170.    As a result, Plaintiffs were denied the full and equal enjoyment of the facilities, goods, and services available to others at the Gold Cup Final.

### **Defendants Violated the Illinois Human Rights Act**

171.    On information and belief, despite having legal and contractual duties to enforce the law (including the Illinois Human Rights Act) and to provide for the safety of all fans, the Chicago Park District, Soldier Field, and its management company surrendered control over Soldier Field to CONCACAF, a soccer organization with an extensive history of hosting events marred by homophobic misconduct.

172.    The Chicago Park District, Soldier Field, and its management company contractually licensed the control Soldier Field's scoreboards and public address systems to CONCACAF during the Gold Cup Final.

173.    Even after numerous Discriminatory Chants occurred during the Gold Cup Final without being addressed, the Chicago Park District, Soldier Field, and its management company failed to assert control over Soldier Field's scoreboards and public address systems.

174.    Even after numerous Discriminatory Chants occurred during the Gold Cup Final without being addressed, the Chicago Park District, Soldier Field, and its management company failed to assert control over Soldier Field  to stop discriminatory behavior from occurring in violation of the Illinois Human Rights Act.

## FIRST CAUSE OF ACTION

### (Violation of the Illinois Human Rights Act –

### Public Accommodations Discrimination Based on Sexual Orientation)

175.    Plaintiffs incorporate by reference each of the preceding paragraphs.

176.    While attending the Gold Cup Final at Soldier Field, Plaintiffs sat and affiliated together for most of the match.  Throughout the event, Plaintiffs wore official U.S. National Team gear celebrating Pride Month.  As a result, Plaintiffs believe that they were perceived as gay men by other attendees and by Soldier Field officials with whom they interacted before, during, and after the match.

177.    Plaintiffs attempted to exercise their rights to the full benefits and enjoyment of Defendants' facilities, by providing the management of Soldier Field and the general counsel of the Chicago Park District with advance written warning of the expected misconduct by Mexico soccer fans, by promptly complaining via text message about pervasive fan misconduct using the security number published by Soldier Field on its website, and by complaining about the

discriminatory conduct to stadium and security officials stationed on the concourse above their seats.

178.     Defendants discriminated against Plaintiffs and similarly situated LGBTQ+ fans by refusing to implement the Three-Step Match Protocol, to eject crowd members who were engaging in discrimination, to respond to Plaintiffs' multiple requests for Defendants to take action before and throughout the match, to take any action in response to the Discriminatory Chant, and to otherwise extend to Plaintiffs the full and equal enjoyment of the facilities, goods, and services of the stadium.

179.     As a result of Defendants' civil rights violations, Plaintiffs experienced a hostile, unsafe, and discriminatory environment that denied them full and equal enjoyment of the facilities, goods, and services available to others at the Gold Cup Final, including but not limited to distress, anxiety, and apprehension from the Discriminatory Chant and the fear that the Discriminatory Chant would escalate to a physical altercation (which some of Plaintiffs had experienced at prior soccer matches), as well as mental anguish that persisted after the match, such as injury to their dignity.

**SECOND CAUSE OF ACTION**

**(Civil Conspiracy to Violate the Illinois Human Rights Act)**

180.     Plaintiffs incorporate by reference each of the preceding paragraphs.

181.     As described in those paragraphs, Defendants unlawfully agreed among themselves and with others to host the Gold Cup Final without taking reasonable and appropriate steps to prevent, address, or stop predictable and foreseeable sexual orientation discrimination, as required under the Illinois Human Rights Act.

182.     In other words, the lack of action documented above reflects, on information and belief, a simple agreement: Defendants and/or conspirators agreed to host the 2019 Gold Cup Final

without taking reasonable and appropriate steps to prevent or stop predictable and foreseeable sexual orientation discrimination, as required under state law.

183.   In furtherance of this agreement, Defendants refused to implement the Three-Step Match Protocol, to eject crowd members who were engaging in discrimination, to respond to Plaintiffs' multiple requests for Defendants to take action before and throughout the match, and to otherwise extend to Plaintiffs the full and equal enjoyment of the facilities, goods, and services of the stadium.

184.   As a result of Defendants' concerted civil rights violations, Plaintiffs experienced a hostile, unsafe, and discriminatory environment that denied them full and equal enjoyment of the facilities, goods, and services available to others at the Gold Cup Final, including but not limited to physical distress, anxiety, and apprehension from the Discriminatory Chant and the fear that the Discriminatory Chant would escalate to a physical altercation (which some of Plaintiffs had experienced at prior soccer matches), as well as mental anguish that persisted after the match, such as injury to their dignity.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.   For all Make Whole relief as authorized by Section 8A-104(J) of the Illinois Human Rights Act by taking "any action as may be necessary" in order to make Plaintiffs whole, including but not limited to the award of actual, compensatory, and general damages;

2.   For a Cease and Desist Order as authorized by Section 8A-104(A) of the Illinois Human Rights Act commanding Defendants to cease and desist from violating the Act by failing

to protect LGBTQ+ patrons from homophobic abuse by other patrons during events at Soldier Field;

3.      For a Cease and Desist Order as authorized by Section 8A-104(A) of the Illinois Human Rights Act commanding Defendants to extend to Plaintiffs and all similarly situated LGBTQ+ patrons the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendants, including but not limited to Soldier Field;

4.      For an Order as authorized by Section 8A-104(F) of the Illinois Human Rights Act commanding Defendants to extend to Plaintiffs and all similarly situated LGBTQ+ patrons the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the Defendants, including but not limited to Soldier Field;

5.      For an Order as authorized by Section 8A-104(F) of the Illinois Human Rights Act or a permanent injunction requiring Defendants to comply with the Illinois Human Rights Act by protecting LGBTQ+ patrons from homophobic abuse by other patrons during all events at Soldier Field;

6.      For all actual damages of Plaintiffs as authorized by Section 8A-104(B) of the Illinois Human Rights Act;

7.      For all attorney fees incurred by Plaintiffs both during this action and during the pendency of their charges before the Illinois Department of Human Rights, as authorized by Section 8A-104(G) of the Illinois Human Rights Act;

8.      For all costs, including expert witness fees, incurred by Plaintiffs both during this action and during the pendency of their charges before the Illinois Department of Human Rights, as authorized by Section 8A-104(G) of the Illinois Human Rights Act;

9.      For all attorneys' fees and costs as appropriate;

10. For all costs and expenses of collection incurred through the collection of judgment, including reasonable attorneys' fees and legal expenses; and,

11. For any other relief as the Court deems just and proper.


Dated: January 27, 2022                              Respectfully submitted,

                                                       /s/ John E. Drosick
                                                       Julie A. Bauer
                                                       John E. Drosick
    Thomas J. Neuner
    Tyree Petty-Williams
    WINSTON & STRAWN LLP
    35 W. Wacker Dr.
    Chicago, IL 60601
    Telephone: (312) 558-5600
    Fax: (312) 558-5700
    JBauer@winston.com
    JDrosick@winston.com
    TNeuner@winston.com
    TPettyWilliams@winston.com