UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JORDAN PENLAND, KARL GERNER, EDWARD R. BURKE, AND PAUL C. BURKE, | |
| Plaintiffs, | Case No. 1:21-cv-05581 |
| v. | Judge John Robert Blakey |
| CHICAGO PARK DISTRICT, SOLDIER FIELD, AND ASM GLOBAL | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Jordan Penland, Karl Gerner, Edward Burke, and Paul Burke sue Defendants Chicago Park District, Soldier Field, and ASM Global[1] alleging: (1) violation of the Illinois Human Rights Act's prohibition on public accommodations discrimination; and (2) civil conspiracy.

For the reasons described below, the Court grants Defendants' motion, [63], and dismisses both counts without prejudice.

---

[1] Soldier Field, erroneously included as a defendant, is owned by Chicago Park District (CPD) and is not a standalone entity. [64] at 1. Additionally, CPD contracted with SMG, erroneously named as "ASM Global," to provide operations and management services at Soldier Field, including security, crowd management, and medical services. [29] ¶ 30; [64] at 3. CPD and SMG, then, are the proper Defendants. [64] at 1.

1

I.  **Background**[2]

Plaintiffs, four members of the LGBTQ+ community,[3] attended the 2019 Confederation of North, Central America and Caribbean Association Football (CONCACAF) Gold Cup Final at Soldier Field. They bring this suit to challenge the actions of the Chicago Park District (CPD) and its operations and management services provider, SMG, during the game.

The Complaint centers on allegations of homophobic chanting throughout the soccer game. [29] ¶ 18. As background, Plaintiffs allege that fans of the Mexico national soccer team have chanted "eeeh puto," frequently throughout games for almost a decade (hereinafter "the Chant"). According to the Complaint, the word "puto" is a vulgar term for a male sex worker. [29] ¶¶ 19–24. In the context of a soccer game, the chant "screams at LGBTQ+ patrons that their sexual orientation makes them less masculine, a less worthy participant in sporting events, and a less worthy person." *Id.* at 4. During previous Gold Cup tournament games, including each Gold Cup match leading up to the 2019 final, Mexico fans have used the Chant, despite repeated fines and sanctions against the Mexican Football Federation. *Id.* ¶¶ 25–27. This issue has garnered significant media attention. *Id.* ¶ 24.

---

[2] The Court draws the facts from the First Amended Complaint, [29] ("Complaint"), taking them as true for purposes of the motion to dismiss.

[3] The Complaint explicitly states that three of the four Plaintiffs are gay men, [29] ¶ 5, and as to the fourth, only that those he encountered also perceived him as gay, *id.* ¶ 60. Elsewhere, the Complaint refers to the plaintiffs collectively as "LGBTQ+." *Id.* at 2. Because the Illinois Human Rights Act protects against discrimination based on actual or perceived sexual orientation, *see* 775 Ill. Comp. Stat. 5/103(Q), any distinction bears no legal significance for Plaintiffs' claims.

Plaintiffs allege that Defendants must have known that the Chant would occur at the 2019 Gold Cup Final. [29 ] ¶ 28. The Complaint describes Defendants' roles and relationships to other entities involved in the game, referencing the Event Management Contract and Defendants' decision to grant CONCACAF exclusive control of the public announcement system and video boards during the game. *Id.* ¶ 40. Plaintiffs assert, upon information and belief, that Defendants must have discussed the Chant amongst themselves and with CONCACAF. *Id.* ¶ 44.

Moreover, four days before the 2019 Gold Cup Final, Plaintiffs notified Defendants via email of the likelihood of the Chant occurring, warning them that Plaintiffs believed a failure to intervene would violate the Illinois Human Rights Act ("IHRA"). *Id.* ¶¶ 48–52. In the email, Plaintiffs referenced CONCACAF's three-step protocol for dealing with racist and/or discriminatory behavior, including chants, in stadiums. *Id.*; [29-36]. The protocol includes the following steps: (1) stop the game and make a stadium announcement; (2) suspend the game for five to ten minutes while teams are sent to the dressing rooms and another stadium announcement is made; and (3) abandon the match if the behavior is continued.[4] *Id.* The protocol requires referees to implement these steps in order, advancing to the next step if the preceding one fails to stop the discriminatory behavior. *Id.*

---

[4] The Complaint alleges that CONCACAF itself has never implemented the protocol, [29] ¶ 42, leaving open a question as to whether any entity has done so. While the attached exhibit indicates that referees will enact the protocol, *see* [29-36], the Complaint does not indicate what, if any, relationships Defendants have with the referees.

3

The email also invoked Soldier Field's Code of Conduct, which prohibits "profane, disruptive or abusive language or gestures, offensive or disorderly conduct," among other forms of disruptive behavior. [29] at 122.

Plaintiffs received no reply to the email. [29] at 48–52. Nonetheless, they chose to attend the game. Upon arrival, as anticipated, Plaintiffs soon observed the Mexico fans chanting the homophobic slur. After the first instance of the Chant, Plaintiffs contacted Soldier Field's security phone number. *Id.* ¶¶ 69–71. In reply, they received two middle finger emojis from someone who stated that he or she was not Soldier Field security.[5] *Id.* ¶ 70.

Further attempting to address the discriminatory behavior, Plaintiffs complained about the Chant to stadium officials and a security guard at halftime. Officials allegedly refused to take action, "expressing either (a) no understanding about the meaning of the Discriminatory Chant, or (b) no willingness to quell the sexual orientation discrimination out of fear of 'angering' the Mexico soccer fans." [29] ¶¶ 117–25.

In total, during the 2019 Gold Cup Final, Mexico soccer fans used the Chant twenty-eight times, an average of once every three minutes and twelve seconds of match play. [29] ¶ 18. No one implemented CONCACAF's three-step protocol. *Id.* ¶¶ 159–74. Plaintiffs allege that there would be other circumstances in which

---

[5] Plaintiffs do not suggest that security officials sent these emojis but rather believe that the number did not connect them to Soldier Field security because the stadium's online guide, where Plaintiffs found the number, was outdated. [29] ¶¶ 69–71. They allege that failure to update the website unlawfully endangered LGBTQ+ fans. *Id.*

4

Defendants would approach security issues differently: if, for example, the discrimination at issue was racial. *Id.* ¶ 165.

Plaintiffs wore Team USA jerseys to the game with rainbow-colored numbers on their backs that identified and associated them with the LGBTQ+ community. [29] ¶ 62. In addition to hearing the Chant directed at events on the field, Plaintiffs allege that fans in the surrounding area began directing the Chant at Plaintiff's specifically, upon seeing Plaintiffs' jerseys and observing their "noticeable disdain and discomfort from hearing the Discriminatory Chant." *Id.* Plaintiffs describe the harms they suffered, "including but not limited to physical distress, anxiety, and apprehension from the Discriminatory Chant and the fear that the Discriminatory Chant would escalate to a physical altercation (which some of the Plaintiffs had experienced at prior soccer matches), as well as mental anguish that persisted after the match, such as injury to their dignity." *Id.* ¶ 184.

After the game, the Illinois Department of Human Rights (IDHR) investigated the incident at Plaintiff's request and found "substantial evidence"[6] that Plaintiffs were denied full and equal enjoyment of the event due to their sexual orientation. [29-35] at 9. The IDHR drew an analogy to a group of Black plaintiffs faced with a crowd chanting the N-word, and found that, "because the chant is a direct homophobic slur that went repeated[ly] unabated, [Plaintiffs] may be able to show in future proceedings that the slur caused [them] to have been unable to fully enjoy the event."

---

[6] Illinois law defines "substantial evidence" in IDHR context as "evidence which a reasonable mind accepts as sufficient to support a particular conclusion and which consists of more than a mere scintilla but may be somewhat less than a preponderance." 775 Ill. Comp. Stat. 5/7A-102(D)(2).

...

[29-35] at 21. Upon receiving the IDHR's findings, Plaintiffs sued Defendants in state court. [29]. Defendants removed the case to federal court,[7] [1], and now challenge the sufficiency of Plaintiffs' claim under Federal Rule of Civil Procedure 12(b)(6).

## II. Legal Standard

To survive a motion to dismiss for failure to state a claim, Fed. R. Civ. P. 12(b)(6), the complaint must include sufficient factual allegations to show a plausible right to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, the facts in the complaint must present a claim that rises "above the speculative level." *Id.* at 545. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" cannot by themselves satisfy Rule 8's requirement that the complaint show the plaintiff is entitled to relief. Fed. R. Civ. P. 8(a)(2); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When considering whether the complaint demonstrates a plausible right to relief, the Court accepts all well-pleaded factual allegations as true and views them in the light most favorable to the plaintiff. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). In contrast, "legal conclusions and conclusory allegations" are "not entitled to this presumption of truth" and should not be considered when deciding on a motion to dismiss. *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir.

---

[7] Plaintiffs properly joined and served the Chicago Park District, a citizen of the forum state, prior to the removal of the action to federal court. Thus, removal violated the statutory provision precluding the exercise of diversity jurisdiction where "any of the parties in interest properly joined and served" as defendants are "a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b)(2). This defect, however, is non-jurisdictional, *see Hurley v. Motor Coach Indus., Inc.*, 222 F.3d 377, 379 (7th Cir. 2000), and Plaintiffs did not raise it within the requisite 30-day period, *see* 28 U.S.C. § 1447(c). Thus, based upon the current record, this Court appears to have jurisdiction over this case.

2011). If the Court finds, after eliminating any legal conclusions and considering only the plaintiff's factual allegations, that the complaint does not show a plausible right to relief, then the moving party's motion to dismiss should be granted. *Iqbal*, 556 U.S. at 679.

### III. Discussion

Plaintiffs assert two claims: (1) Defendants violated the IHRA's prohibition on public accommodations discrimination; and (2) Defendants engaged in civil conspiracy. The Court considers each claim in turn.

#### A. Public Accommodations Discrimination

Count I alleges that Defendants' conduct during the 2019 Gold Cup Final violated the IHRA's prohibition on sexual orientation discrimination in public accommodations. 775 Ill. Comp. Stat. 5/5-102. The IHRA makes it a "civil rights violation for any person on the basis of unlawful discrimination" to deny or refuse to another the "full and equal enjoyment of the facilities, goods, and services of any public place of accommodation." *Id.*[8] The IHRA's definition of unlawful discrimination includes discrimination based upon actual or perceived sexual orientation. 775 Ill. Comp. Stat. 5/103(Q).

---

[8] Because the IHRA's public accommodations provisions are similar to Title II of the Civil Rights Act of 1964, Illinois courts routinely seek guidance from Title II decisions to analyze discrimination actions brought under the IHRA. *Ellis v. Illinois Hum. Rts. Comm'n*, No. 1-19-1871, 2020 WL 3447480, at *6 (Ill. App. Ct. June 23, 2020).

To begin, Defendants challenge the sufficiency of the Complaint,[9] arguing that Plaintiffs "received the full benefit and enjoyment of attending the Gold Cup Final" and thus do not allege any actionable denial. [64] at 8.

This Court agrees that the Complaint, as currently drafted, fails to state a plausible claim, but not necessarily for the reasons Defendants argue. Instead, as discussed below, the Complaint fails to provide proper notice of how Defendants' actions or inactions proximately caused the denial of a publicly available facility, good, or service; and whether or how Defendants allegedly acted (or failed to act when required to do so), because of Plaintiffs' protected status.

First, the Complaint does not clearly identify the alleged denial at issue. On the one hand, it suggests discrimination based upon a hostile environment theory: the fans' chanting created a pervasively hostile environment and as such, Plaintiffs were denied full and equal access to the game itself or Soldier Field as a whole. [29] ¶ 179 ("Plaintiffs experienced a hostile, unsafe, and discriminatory environment that

---

[9] Here, the parties frame their arguments around the *prima facie* elements of a public accommodations discrimination claim—a standard most relevant at summary judgment. To state a *prima facie* case of discrimination using circumstantial evidence, a plaintiff must prove: that they (1) are members of a protected class; (2) attempted to exercise the right to the full benefits and enjoyment of a place of public accommodation; (3) were denied those benefits and enjoyment; and (4) were treated less favorably than similarly situated persons outside of their protected class. *See Straw v. Illinois State Bd. of Elections*, No. 1-19-1783, 2020 WL 5536728, at *6 (Ill. App. Ct. Sept. 15, 2020), *appeal denied*, 159 N.E.3d 945 (Ill. 2020). If a plaintiff can plead the *prima facie* elements successfully, Illinois courts shift the burden to the defendant in a process, known in the federal system, as the *McDonnell-Douglas* burden shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Ortiz v. Werner Enters.*, 834 F.3d 760, 763 (2016) (holding that even when employing the *McDonnell Douglas* framework, the court must ultimately consider all relevant evidence "as a whole"). Illinois courts have adopted this framework as a mechanism for proving discrimination under the IHRA. *See Zaderaka v. Illinois Hum. Rights Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989); *Williams v. Hum. Rights Comm'n*, No. 1-20-0927, 2022 WL 1265480 (Ill. App. Ct. Apr. 28, 2022). But the requirements of the prima facie case apply at summary judgment, *see Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002). Under federal notice pleading standards, however, Plaintiffs must simply state a plausible claim to relief, providing proper notice to Defendants of the grounds upon which it rests. See *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.

denied them full and equal enjoyment of the facilities, goods, and services available to others at the Gold Cup Final."). Defendants' motion assumes this might be the theory and thus attack its viability because, according to them, Illinois law does not recognize this is a legal basis for an IHRA public accommodations claim.[10] But Plaintiffs' response does not defend their claim on such a theory. Instead, Plaintiffs try to distinguish Defendants' cited case law on an unrelated basis[11] and then state that their claim rests instead upon the Defendants' alleged denial of "security services." [67] at 10.

The denial of a concrete service (such as security) suggests a more traditional claim of disparate treatment discrimination. But the Complaint does not sufficiently allege a claim on this basis either. To be sure, the lengthy Complaint sets forth a variety of errors that Defendants and third parties allegedly made, but it fails to identify or establish which of these failures allegedly constitute the discrimination.

---

[10] In support of their argument, Defendants cite case law that, according to them, establishes that discriminatory comments or other hostilities cannot form the basis of an actionable denial under the IHRA in the public accommodations context and urge the Court to dismiss the claim with prejudice on this basis. *See* [64] at 7 (citing, among others, *Gaylord v. Ill. Human Rights Comm'n*, No. 1-18-2578, 2020 WL 2791827, at *5 (Ill. App. Ct. 2020); *Mallett v. Human Rights Comm'n*, No. 1-19-2397, 2021 WL 1856925 (Ill. Ct. App. 2021). The question, however, may not be as clear-cut as Defendants suggest, at least when a factual record shows repeated, unabated discriminatory comments. *See, e.g. In the Matter of the Request for Review by: Fred E. Wilson*, Charge No. 2021SP1819, 2022 WL 4117724 (IHRC Aug. 23, 2022) (acknowledging possibility of racial harassment claim in the public accommodations context). The IDHR's findings with respect to Plaintiffs' complaint underscores this possibility. But the Court will not delve further into this question without a clear indication that this is, indeed, the type of claim Plaintiffs intend to pursue.

[11] Plaintiffs attempt to distinguish Defendants' cited cases based on the Illinois Department of Human Rights' finding of substantial evidence in each case, ignoring the question of whether the cases stand for a substantive rule of law regarding whether and when discriminatory comments can give rise to a viable discrimination claim. *See* [67] at 10.

9

For example, Plaintiffs allege multiple things that Defendants should have done prior to the game. For example, they allege that Defendants should have negotiated with CONCACAF to ensure that CONCACAF's three-step protocol would be implemented. [29] ¶¶ 42-45. They also allege that Defendants should not have ceded control of Soldier Field's PA system to CONCACAF. *Id.* Further, they allege that Defendants should have trained and instructed the security guards about the meaning of the Chant. *Id.* ¶ 119. Plaintiffs also allege that they should have updated their website with a current security phone number. *Id.* ¶ 71.

These allegations, however, fail to plausibly show that Defendants caused a denial of access to an existing service. Instead, they suggest a failure to have created a particular service in the first place. The IHRA contemplates denial of existing services, which arguably may include failure to provide existing security services. But it remains less clear exactly whether or how the IHRA imposes the affirmative duty to create new or different security services in a public accommodation context. Yet, even if the IHRA created such a legal duty (which Plaintiffs fail to allege or support), the IHRA also requires denial of a service *on account of* a protected status. In this regard, the Complaint does not make the requisite connection, nor does it otherwise plausibly allege that Defendants failed to put in place certain security services on the account of Plaintiffs' protected status.[12]

---

[12] In some respects, these allegations might suggest a *Monell* type theory of liability that a plaintiff may bring against state actors under federal civil rights laws. That is, that Defendants should be held liable because their inaction created a *de facto* policy that allowed others to violate Plaintiffs' rights. But the Complaint fails to allege any such claim, and the Court offers no opinion on whether the IHRA would even recognize such a theory of liability.

10

Next, Plaintiffs allege that Defendants failed to act after Plaintiffs texted the security phone number posted online and then complained to officials at half-time. [29] ¶¶ 69–70; 117–19. Even if Defendants failed to act, the Complaint's allegations then fail to specify whether Defendants failed to act because they had homophobic motives of their own, or whether the fans' alleged sexual orientation discrimination can somehow be attributed to Defendants.

On the one hand, the Complaint suggests that Defendants refused to act because of the content of the Chant itself. For example, Plaintiffs allege that if the fans had chanted a racial slur, Defendants would have acted differently. [29] ¶¶ 165–66. On the other hand, the Complaint also alleges that Plaintiffs wore rainbow jerseys, that they believe fans chanted at them specifically, and that the stadium officials with whom they interacted perceived them as LGBTQ+. *Id.* ¶ 176. This second set of facts suggests that Plaintiffs believe Defendants saw them, perceived them as gay, and denied them services as a result.[13] These are very different theories of legal accountability, since whether fans behaved in a discriminatory manner remains a separate question from whether *Defendants* acted or decided not to act on a prohibited basis. *See Clark v. Safeway*, 478 F. Supp. 3d 1080 (D. Or. 2020) (distinguishing between the discriminatory behavior of a public accommodations provider and that of a third party, as well as between inconsistent enforcement and discrimination). By blurring the lines between these important questions and failing

---

[13] The plausibility of Plaintiffs' claims as drafted remains unclear, especially where the current Complaint states the security officials refused to act for other reasons—namely, out of ignorance regarding the meaning of the Chant and/or a fear of angering the Mexico fans. *See* [29] ¶ 118.

11

to make the requisite connections between the Defendants and resulting harms, the Complaint does not provide Defendants sufficient notice of Plaintiffs' claim.

Finally, even putting aside these ambiguities, the Complaint, by repeatedly referring to Defendants collectively, obfuscates whether Plaintiffs believe that each Defendant directly acted (or failed to act), or if Plaintiff seeks to hold a Defendant liable for someone else's action or inaction. For example, at times the Complaint alleges that Defendant SMG was responsible for providing certain security services. [29] ¶ 12. Yet, it also alleges that both Defendant SMG and the Chicago Park District discriminated against them by failing to provide those security services. *Id.* ¶¶ 174, 178. Based upon such allegations, it remains unclear if Plaintiffs allege that the Chicago Park District had direct responsibility for security services or if the Complaint alleges some other vicarious liability theory. In addition, the Complaint also states that third parties such as CONCACAF were responsible for providing other services or deciding when to implement the three-step protocol. *Id.* ¶¶ 42-45, 171-72. Yet, the Complaint includes those among the services that Plaintiffs were denied. *Id.* ¶ 178. From this, it appears Plaintiff may seek to hold Defendants liable for a third party's failure to provide certain services.

Overall, the current Complaint alleges many things that Defendants and third parties failed to do both before and during the game. But it fails to provide proper notice of the actual claim that Plaintiff alleges against each Defendant. Instead, it leaves Defendants (and the Court) to guess at their claims and legal theories, which

12

does not satisfy the relatively low bar of notice pleading. The Court thus dismisses the claim with leave to replead.[14]

## B. Civil Conspiracy

Defendants also challenge Plaintiffs' second cause of action: civil conspiracy. Defendants argue that Plaintiffs' civil conspiracy claim fails because the IHRA preempts it. This Court agrees.

Under Illinois law, civil conspiracy does not constitute a standalone tort. As the Illinois Supreme Court explained in *Adcock v. Brakegate Ltd.*, civil conspiracy actions provide a mechanism to hold accountable members of a conspiracy for the tortious actions of other members. 645 N.E.2d 888, 894 (Ill. 1994). Thus, Plaintiffs must allege a viable tortious or unlawful act as the basis for a civil conspiracy claim. Here, Plaintiffs explicitly allege that Defendants conspired to violate the Illinois

---

[14] Before moving on to the civil conspiracy claim, one final issue bears further discussion here. Defendants argue that any discrimination claim Plaintiffs might attempt to bring based upon the events of the 2019 Gold Cup Final would be "foreclosed by statute." [64] at 5. Defendants point to the following exception written into the IHRA: "With respect to a place of public accommodation… the exercise of free speech, free expression, free exercise of religion or expression of religiously based views by any individual or group of individuals that is protected under the First Amendment to the United States Constitution or under Section 3 of Article I, or Section 4 of Article I, of the Illinois Constitution, shall not be a civil rights violation." 775 ILCS 5/5-102.1(b). Defendants argue that this exception forecloses any possible claim Plaintiffs might bring, because the claim would be necessarily based upon fans' First Amendment-protected speech. [68] at 5. Plaintiffs respond the exception does not apply because Plaintiff are suing Defendants, not the fans, and Defendants were not exercising their own free speech rights at the Gold Cup Final. [67] at 5. Even assuming Defendants' interpretation of the exception were correct (which this Court need not decide), the exemption would still only apply if the claims involved a First Amendment protection of the fans' right to chant "puto" at Soldier Field. While Defendants maintain that their argument is merely statutory (and thus, they suggest, straightforward), the exemption provision itself incorporates complex constitutional principles (for example, the First Amendment protects free speech, but it also recognizes certain reasonable time, place and manner restrictions). Plaintiffs recognize this, arguing in response that SMG's role does not constitute state action. [67] at 5. Without clear notice as to what claims and theories are being alleged by Plaintiffs, however, this last issue remains a complex question of statutory and constitutional interpretation which is not yet ripe for resolution.

Human Rights Act. The IHRA, however, expressly preempts common law remedies—including civil conspiracy—for civil rights violations. *See Maksimovic v. Tsogalis*, 687 N.E.2d 21, 23 (Ill. 1997); *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 604 (7th Cir. 2006) ("The distinction between claims that are preempted and claims that are not preempted turns on the legal duty that the defendant allegedly breached; that is, if the conduct would be actionable even aside from its character as a civil rights violation because the IHRA did not furnish the legal duty that the defendant was alleged to have breached, the IHRA does not preempt a state law claim seeking recovery for it." (internal citations and quotations omitted)).

Plaintiffs appear to suggest in their response to Defendants' motion to dismiss that they may have a civil conspiracy claim premised on a duty of care Defendants owed them. But Plaintiffs still fail to identify any viable tort or common law duty of care, describing the duty of care instead as one Defendants owed *under the IHRA*. [67] at 12. Again, Plaintiffs seek a common law remedy for a statutory civil rights violation—which Illinois law expressly precludes. In drafting any second amended complaint, this Court advises Plaintiffs' counsel to review the obligations of all attorneys under Federal Rule of Civil Procedure 11.

The Court dismisses Count II. As with Count I, the dismissal is without prejudice. Plaintiffs remain free to amend this count if they can do so under Rule 11.

### C. Illinois Local Government and Governmental Employees Tort Immunity Act

Defendants also argue that the Illinois Local Government and Governmental Employees Tort Immunity Act (TIA), 745 Ill. Comp. Stat. 10/2, renders CPD immune from suit. [64] at 13–14. The TIA extends immunity to local government actors and entities facing tort liability in certain circumstances, thus ensuring that private damages awards do not dissipate public funds. *See Reyes v. Bd. of Educ.*, 139 N.E.3d 123, 133 (Ill. App. Ct. 2019). Plaintiffs respond that the TIA does not immunize Defendants from civil rights actions and further note that the TIA's provisions protect local government actors only from damages actions, and not from suits for injunctive relief.[15] [67] at 15. Because the Court grants Defendants' motion to dismiss on other grounds, however, the Court declines to interpret the TIA's implications at this stage.

### IV. Conclusion

For the reasons stated herein, the Court grants Defendants' motion to dismiss, [63], and dismisses both counts without prejudice.

Dated: February 17, 2023

ENTERED:

John Robert Blakey
United States District Judge

---

[15] The Complaint seeks both damages and equitable relief. *See* [29] at 39–41.