## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Jordan Penland, Karl Gerner, Edward R. Burke, and Paul C. Burke,

    *Plaintiffs*,

v.

Chicago Park District, and ASM Global,

    *Defendants*.

No. 21 CV 5581

Judge Lindsay C. Jenkins

### MEMORANDUM OPINION AND ORDER

Plaintiffs Jordan Penland, Karl Gerner, Edward R. Burke, and Paul C. Burke (collectively, "Plaintiffs") bring this suit against the operators of Soldier Field—Defendants Chicago Park District ("Park District") and ASM Global (collectively, "Defendants")—for denying them full and equal enjoyment in a place of public accommodation in violation of the Illinois Human Rights Act ("IHRA"). [Dkt. No. 84.] The Court previously granted Defendants' motion to dismiss the first amended complaint without prejudice. [Dkt. No. 77.] Plaintiffs have since refiled their second amended complaint. [Dkt. No. 84.] Before the Court is Defendants' motion to dismiss the Second Amended Complaint ("SAC") pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. [Dkt. No. 87.] For the reasons stated below, Defendants' motion is denied. [*Id.*]

## I.     Background[1]

### A.     Plaintiffs' Second Amended Complaint

Much like the FAC, the SAC largely concerns the 2019 Confederation of North, Central America and Caribbean Association Football (CONCACAF) Gold Cup Final ("2019 Gold Cup Final") held at Soldier Field, and the Park District and ASM Global's actions or inactions prior to and during the game. *See generally* [Dkt. No. 84.] Plaintiffs identify as four members of the LGBTQ+ community and fans of the Mexican national soccer team, which played in the 2019 Gold Cup Final.[2] [*Id.* at ¶¶ 1–4, 47–49.] The Park District is the public entity that owns and operates Soldier Field. [*Id.* at ¶¶ 5–8.] ASM Global is a "global facility management and venue services company that operates and manages Soldier Field pursuant to a contract between the Chicago Park District and SMG, a predecessor of ASM Global." [*Id.* at ¶ 9.] Plaintiffs allege that both the Park District and ASM Global act as "Operator[s]" of Soldier Field within the meaning of the IHRA. [*Id.* at ¶¶ 8, 10.] As operators of Soldier Field, Plaintiffs allege that Defendants have bound themselves through a variety of agreements to comply with the IHRA. *See generally* [*id.* at ¶¶ 14–17, 23–31].

As before, the SAC concerns allegations of homophobic chanting throughout

---

[1]     The Court relies on the facts and conclusions drawn in the prior order. *See generally* [Dkt. No. 77.] For purposes of Defendants' motion to dismiss, much as before, the Court accepts as true all well-pled allegations set forth in the complaint and draws all reasonable inference in Plaintiffs' favor. *See Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017).

[2]     As noted previously, [Dkt. No. 77 at 2 n.3], while Plaintiffs do not all identify as members of the LGBTQ+ community [Dkt. No. 84 at ¶¶ 1–4], because the IHRA protects against discrimination based on actual or *perceived* sexual orientation, *see* 775 Ill. Comp. Stat. 5/103(Q), this distinction between the Plaintiffs is irrelevant.

the 2019 Gold Cup Final. Plaintiffs allege that Mexican national soccer team fans have chanted "¡eeeh puto!" ("the Chant") at games for almost a decade. [*Id.* at ¶¶ 35, 39–41.] According to the Plaintiffs, the word "puto" is a vulgar term for a male sex worker and, in this context, "is a taunt that intentionally targets, offends, and endangers LGBTQ+ patrons based on sexual orientation." [*Id.* at ¶¶ 33–35.] During previous Gold Cup tournament games, including each Gold Cup match leading up to the 2019 final, Mexico fans have used the Chant, despite repeated fines and sanctions against the Mexican Football Federation. [*Id.* at ¶¶ 35, 39–41.] Because of the Chant's frequent use at games, including the games leading up to the 2019 Gold Cup Final, Plaintiffs allege that it was foreseeable that Mexican national team fans would use the Chant at the 2019 Gold Cup Final. [*Id.* at ¶ 42.]

Plaintiffs additionally allege that they notified Defendants via email of the likelihood of the Chant occurring, warning them that Plaintiffs believed a failure to intervene would violate the IHRA. [*Id.* at ¶¶ 43–44.] In the email dated July 3, 2019—four days before the 2019 Gold Cup Final—Plaintiffs emailed Soldier Field's Assistant General Manager, Kevin Walsh, to warn stadium officials that the operators at Soldier Field "should expect[] that tens of thousands of fans will attempt to participate in homophobic chants at the Gold Cup Final." [*Id.* at ¶ 44.] Plaintiffs referenced CONCACAF's three-step protocol for dealing with discriminatory behavior, including chants, in stadiums. [*Id.*] The protocol requires the following escalating steps, including: (1) stopping the game and making a stadium announcement; (2) suspending the game for five to ten minutes while teams are sent

to the dressing rooms and another stadium announcement is made; and (3) abandoning the match if the behavior is continued. [*Id.*] The protocol requires referees to implement these steps in order, advancing to the next step if the preceding one fails to stop the discriminatory behavior. [*Id.*] Plaintiffs' email also invoked Soldier Field's Code of Conduct, which prohibits "profane, disruptive or abusive language or gestures, offensive or disorderly conduct," among other forms of disruptive behavior. [*Id.*] Plaintiffs additionally allege that they emailed the Park District General Counsel Timothy King with a similar message that same day. [*Id.* at ¶ 45.] Plaintiffs contend that CPD did not respond to these messages.[3] [*Id.* at ¶ 46.]

Plaintiffs nevertheless attended the 2019 Gold Cup Final. [*Id.* at ¶ 47–49.] As they expected, Mexican national soccer team fans yelled the Chant at the outset of the game. [*Id.* at ¶ 53.] After the second use of the Chant, Plaintiffs contacted by text message Soldier Field's security phone number. [*Id.* at ¶ 54.] In reply, they received two middle finger emojis from someone who stated that he or she was not Soldier Field security.[4] [*Id.* at ¶ 55.]

After the Chant was used seventeen times in the first half of the game,

---

[3]     Plaintiffs additionally allege that Soldier Field did not respond to these messages. [Dkt. No. 84 at ¶ 84.] As previously explained, Soldier Field is not a properly named Defendant. [Dkt. No. 77 at 1 n.1.] As such, this Court ignores these allegations for purposes of the motion to dismiss.

[4]     Plaintiffs do not suggest that Soldier Field stadium security officials actually sent these messages but rather believe that the phone number provided was outdated. [Dkt. No. 84 at ¶ 55.] Much as in the FAC, Plaintiffs allege that Defendants' failure to update the phone number led to the use of the Chant at the 2019 Gold Cup Final. [*Id.* at ¶¶ 73–74, 85.]

Plaintiffs complained to stadium officials, "including a security guard stationed on the concourse above their seats." [*Id.* at ¶ 56.] Officials allegedly refused to take any action, as they either did not understand the Chant's meaning or displayed "no willingness to quell the sexual orientation discrimination out of fear of 'angering' the Mexico soccer fans." [*Id.* at ¶ 57.] Plaintiffs allege that "[o]ne stadium official expressly stated that no one . . . had briefed him" about the Chant. [*Id.* at ¶ 58.] Plaintiffs blame ASM Global for failing to properly train security officials about how to respond to the Chant, thereby contributing to fans' harassment. [*Id.* at ¶¶ 59–60.]

In total, during the 2019 Gold Cup Final, Mexican national soccer team fans used the Chant twenty-eight times, an average of once every three minutes and twelve seconds of match play. [*Id.* at ¶ 61.] Plaintiffs allege on information and belief that Defendants CPD and ASM Global did not enforce the Soldier Field Code of Conduct against any fan who participated in the Chant, did not initiate any procedure outlined in the Operations and Procedure Manual concerning crowd management, did not report any fan to local authorities, and did not implement the CONCACAF three-step protocol outlined in Plaintiffs' July 3rd email. [*Id.* at ¶¶ 68–69.]

Plaintiffs argue that Defendants' behavior lies in stark contrast to their response to discriminatory fan conduct in the past. [*Id.* at ¶¶ 74–75.] Specifically, Plaintiffs allege "on information and belief" that Defendants have taken action to prevent discrimination at previous events, "such as anticipating foreseeable discrimination and creating a security plan, responding to online portal messages about potential discrimination, responding to text messages sent to the security

5

number related to discrimination, responding to complaints to ushers and security personnel about discrimination, and enforcing the Soldier Field Code of Conduct." [*Id.* at ¶ 74.] Plaintiffs further allege that Defendants "have taken actions at previous sporting events at Soldier Field and during the 2019 Gold Cup Final based on complaints of verbal harassment and discrimination, such as reprimanding, removing, or ejecting fans, for engaging in discriminatory conduct such as shouting the 'N-word' at Black people, shouting pejorative words at women, or shouting religious slurs at people of faith." [*Id.* at ¶ 75.] Because Defendants failed to act to stop the Chant as described in Plaintiffs' allegations [*id.* at ¶ 76], Plaintiffs plead that "Defendants CPD and ASM Global discriminated against Plaintiffs on the basis of their sexual orientation." [*Id.* at ¶ 77].

Plaintiffs wore Team USA jerseys to the game with rainbow-colored numbers on their backs that identified and associated them with the LGBTQ+ community. [*Id.* at ¶ 50.] As such, both other fans and stadium officials could associate them with the LGBTQ+ community. [*Id.* at ¶ 51.] In addition to hearing the Chant directed at events on the field, Plaintiffs allege that fans in their area of the stands began to "seemingly" direct the Chant at Plaintiffs specifically, on seeing Plaintiffs' jerseys and observing their "noticeable disdain and discomfort from hearing the Discriminatory Chant." [*Id.* at ¶ 82.] Plaintiffs do not allege that stadium officials ever intervened on their behalf. [*Id.* at ¶ 83.]

As a result of this "large, hostile crowd engaging in homophobic misconduct coupled with Defendants' refusals to protect Plaintiffs from disorderly conduct and

unlawful discrimination," Plaintiffs felt "distressed, anxi[ous], and apprehensi[ve]," and even expressed "concern[] for their dignity" and "physical safety." [*Id.* at ¶¶ 83–84, 100.] Plaintiffs note that in the past, they have attended matches where they were physically assaulted by fans engaging in the Chant due to their recognition of Plaintiffs as affiliated with the LGBTQ+ community. [*Id.* at ¶¶ 65–66.] Plaintiffs allege that "Defendants CPD and ASM Global allowed a similarly dangerous and potentially violent mob mentality to foment during the 2019 Gold Cup Final by refusing to take any actions to stop discriminatory conduct." [*Id.* at ¶ 67.]

As such, Plaintiffs allege that "Defendants CPD and ASM Global . . . denied and refused Plaintiffs services at the 2019 Gold Cup Final that could prevent, mitigate, and stop sexual orientation discrimination." [*Id.* at ¶ 72.] Specifically, Plaintiffs allege that Defendants "allowed pervasive sexual orientation discrimination by" ignoring their emails prior to the game, ignoring their text messages and complaints to security personnel during the game, failing to enforce the Soldier Field Code of Conduct or the CONCACAF three-step protocol, "refusing to enforce the provided security services," or "otherwise take measures against pervasive sexual orientation discrimination." [*Id.* at ¶ 85.]

After the game, the Illinois Department of Human Rights (IDHR) investigated the incident and found "substantial evidence"[5] that Plaintiffs were denied full and

---

[5] Illinois law defines "substantial evidence" in IDHR context as "evidence which a reasonable mind accepts as sufficient to support a particular conclusion and which consists of more than a mere scintilla but may be somewhat less than a preponderance." 775 Ill. Comp. Stat. 5/7A-102(D)(2).

equal enjoyment of the event due to their sexual orientation. [Dkt. No. 29-35 at 4.] The IDHR drew an analogy to a group of Black plaintiffs faced with a crowd chanting the N-word, and found that, "because the chant is a direct homophobic slur that went repeated[ly] unabated, [Plaintiffs] may be able to show in future proceedings that the slur caused [them] to have been unable to fully enjoy the event." [*Id.* at 20.] After the IDHR investigated and issued their findings, Plaintiffs sued Defendants in state court. [Dkt. No. 1, 29.] Defendants thereafter removed the case to this Court. [*Id.*]

## B.   The Previous Order Dismissing the First Amended Complaint

The FAC asserted two claims: (1) a violation of the IHRA's prohibition on public accommodations discrimination; and (2) a civil conspiracy claim. [Dkt. No. 29]. Except where noted, the SAC contains substantially the same underlying factual allegations as the FAC as to the public accommodation discrimination claim, *compare* [Dkt. No. 29] *with* [Dkt. No. 84]. Plaintiffs have not realleged their civil conspiracy claim in the SAC, so the Court does not discuss it further. [Dkt. No. 84.]

In its prior Order, the Court held that the FAC failed to state an IHRA public accommodation claim. [Dkt. No. 77 at 8.] Specifically, the Court concluded that Plaintiffs "fail[ed] to provide proper notice of how Defendants' actions or inactions proximately caused the denial of a publicly available facility, good, or service; and whether or how Defendants allegedly acted (or failed to act when required to do so), because of Plaintiffs' protected status." [*Id.*] In reaching this conclusion, the Court discussed three areas of concern regarding this claim. [*Id.* at 8–13.]

First, the Court explained that "the Complaint does not clearly identify the

8

alleged denial at issue." [*Id.* at 8.] After discussing how Plaintiffs' allegations might suggest a hostile environment theory, the Court ultimately addressed the claim as "a more traditional claim of disparate treatment discrimination." [*Id.* at 9.] After acknowledging that the FAC identified a lengthy list of errors alleged made by Defendants and third parties, the Court explained that the FAC failed to "identify or establish which of the alleged failures constitute the discrimination." [*Id.* at 9–12.] By way of example, the Court discussed several of the proffered examples that Plaintiffs alleged Defendants should have taken prior to the game, but ultimately observed that the errors failed to "plausibly show that Defendants cause[d] a denial of access to an existing service." [*Id.* at 9–10.] Even read as a "failure to have created a particular service in the first place," the Court concluded that the claim failed because the IHRA "also requires denial of a service *on account of* a protected status," which the FAC failed to make. [*Id.*]

The Court next addressed Plaintiffs' allegations concerning Defendants' purported failure to update their security phone number and complaints to security officials at half-time. [*Id.* at 11.] The Court concluded that even if Defendants failed to act, the FAC did not specify whether the failure to act was "because [Defendants] had homophobic motives of their own, or whether the fans' alleged sexual orientation discrimination can somehow be attributed to Defendants." [*Id.*] The Court noted that legal accountability on the basis of fans' behavior versus Defendants' actions were "very different theories of legal accountability" and Plaintiffs needed to make the requisite connections to the resulting harms. [*Id.*]

Finally, the Complaint "repeatedly refer[ed] to Defendants collectively," which "obfuscates whether Plaintiffs believe that each Defendant directly acted (or failed to act), or if Plaintiff seeks to hold a Defendant liable for someone else's action or inaction. [*Id*. at 12.]

## II.  Legal Standard

To survive a motion to dismiss for failure to state a claim, Fed. R. Civ. P. 12(b)(6), the complaint must include sufficient factual allegations to show a plausible right to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, the facts in the complaint must present a claim that rises "above the speculative level." *Id*. at 545. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" do not satisfy Rule 8's requirement that the complaint show the plaintiff is entitled to relief. Fed. R. Civ. P. 8(a)(2); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When considering whether the complaint demonstrates a plausible right to relief, the Court accepts all well-pleaded factual allegations as true and views them in the light most favorable to the plaintiff. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). In contrast, "legal conclusions and conclusory allegations" are "not entitled to this presumption of truth" and should not be considered. *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011). If the Court finds, after eliminating any legal conclusions and considering only the factual allegations, that the complaint does not show a plausible right to relief, then the moving party's motion to dismiss should be granted. *See Iqbal*, 556 U.S. at 679.

### III.    Analysis

### A.    Rule Eight Notice Pleading Requirements

Plaintiffs' public accommodations discrimination claim proceeds on a disparate treatment theory of liability. [Dkt. No. 91 at 4 (stating that Defendants "discriminate[d] against LGBTQ+ patrons (the Plaintiffs) on the basis of sexual orientation by failing to prevent, address, or stop a homophobic chant from occurring 28 times when Defendants prohibit other forms of abusive and discriminatory conduct against other patrons").] With this clarification, the Court finds that Plaintiffs have sufficiently supplemented the SAC's allegations rectifying the two primary issues raised in the previous dismissal order. [Dkt. No. 77.]

First, Plaintiffs plausibly allege legal duties under the IHRA. Specifically, the SAC alleges that Defendants violated two duties under the IHRA: (1) "a legal duty to provide Plaintiffs with access to a facility free from unlawful discrimination and to afford Plaintiffs with full and equal enjoyment of the facilities, goods, and services at Soldier Field," and (2) "a legal duty to take corrective action to protect Plaintiffs from a hostile stadium atmosphere in which homophobic harassment and misconduct was pervasive." [Dkt. No. 84 at ¶¶ 94–95.] These duties connect Defendants' actions and inactions to the IHRA to give Defendants notice of what denial Plaintiffs allege is violative of the IHRA. [*Id.* at ¶ 85.] As such, Plaintiffs' legal duty allegations fulfill the prior Court's instructions and meet Rule 8's low bar of notice pleading.

Second, Plaintiffs plausibly allege the requisite connection between Defendants' actions (or inactions) and the harm alleged sufficient to allege causation.

The SAC alleges that Plaintiffs were denied a service on account of their perceived sexual orientation. [*Id.* at ¶¶ 97–99.] As such, Plaintiffs have rectified this noted issue in the prior Court's order. [Dkt. No. 77 at 10.] Further, the SAC specifies the alleged conduct that allows for an inference of discriminatory motives on Defendants' behalf. Specifically, the SAC alleges that both Defendants have previously "reprimand[ed], remov[ed], or eject[ed] fans, for engaging in discriminatory conduct such as shouting the 'N-word' at Black people, shouting pejorative words at women, or shouting religious slurs at people of faith" but failed to do so at the 2019 Gold Cup Final. [Dkt. No. 84 at ¶¶ 75–76.] And, unlike before, the SAC expressly alleges that Defendants "discriminated against Plaintiffs on the basis of their sexual orientation." [*Id.* at ¶ 77.] "Given the context of Plaintiffs' rainbow-colored "Pride" jerseys identifying them as members of LGBTQ+ community, fans' taunts, and stadium officials' inaction, the SAC plausibly alleges that Defendants had discriminatory motives. [*Id.* at ¶¶ 50, 57, 82–83.] Accordingly, Plaintiffs' causation allegations rectify the issues identified in the prior Court's order and meet notice pleading requirements.

**B. Defendants' Other Arguments for Dismissal**

Defendants make two other arguments to dispose of Plaintiffs' SAC. First, Defendants argue that Plaintiffs' lawsuit violates the First Amendment. And second, the Park District argues that it is entitled to immunity under the Tort Claims Immunity Act. The Court addresses each in turn.

1. *The First Amendment*

Defendants argue that Plaintiffs' lawsuit is barred by the First Amendment.

[Dkt. No. 88 at 7–9; Dkt. No. 92 at 2–6.] The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const. amend. I.

Because the Fourteenth Amendment "erects no shield against merely private conduct, however discriminating or wrongful," so too does the First Amendment when applied to the states through the Fourteenth Amendment. *Murphy v. Mount Carmel High Sch.*, 543 F.2d 1189, 1193 (7th Cir. 1976) (quoting *Shelley v. Kraemer*, 334 U.S. 1, 13 (1948)). As such, private entities need not comply with the First Amendment unless they are deemed state actors for First Amendment purposes.[6] *See Wade v. Byles*, 83 F.3d 902, 904–05 (7th Cir. 1996). Accordingly, for Defendants to make out a First Amendment argument for dismissal, ASM Global must be considered a state actor for First Amendment purposes, which Defendants argue it is. [Dkt. No. 88 at 7; Dkt. No. 92 at 3.] Specifically, Defendants argue that by naming the Park District, a public actor, along with ASM Global in this lawsuit and alleging several actions that the two jointly undertook at Soldier Field, Plaintiffs concede that ASM Global is a

---

[6]     While the parties do not dwell on the posture of Defendants' arguments, the Court notes that unlike many of the cases that both parties rely on, *see, e.g.*, *Beckman v. Chi. Bear Football Club, Inc.*, 2018 WL 1561719, at *1 (N.D. Ill. Mar. 30, 2018) (plaintiff asserting a First Amendment claim); *Pasadena Republican Club v. W. Just. Ctr.*, 985 F.3d 1161, 1166 (9th Cir. 2021) (plaintiff asserting a § 1983 claim for a First Amendment violation), Plaintiffs do not bring an affirmative First Amendment claim under a 42 U.S.C. § 1983 framework, [Dkt. No. 84]. Nor do Defendants assert the First Amendment as an affirmative defense of sorts. [Dkt. No. 87.] Rather, Defendants make their argument in a motion to dismiss context as a freestanding argument for the Court to consider. [Dkt. No. 88.] Their arguments, in some ways, resemble a square peg in a round hole.

state actor. [Dkt. No. 88 at 7.] Based on the arguments presented at this time, the Court does not agree.

Defendants cite one in-district case, *Beckman v. Chicago Bear Football Club, Incorporated*, to argue that "this district has found Soldier Field events implicate state action by virtue of Park District ownership." 2018 WL 1561719, at *9 (N.D. Ill. Mar. 30, 2018) ("*Beckman I*"); [Dkt. No. 88 at 7]. As Plaintiffs aptly point out [Dkt. No. 91 at 11–12], although the Court in *Beckman I* found that the complaint made state action plausible at the pleading stage, it clarified its analysis in a subsequent preliminary injunction order. *See Beckman v. Chicago Bear Football Club*, 2018 WL 11200576, at *7 (N.D. Ill. Dec. 13, 2018). The Court in *Beckman II* expressly noted that the fact that Soldier Field was publicly funded but leased to a private actor— such as a sports team—did not render that actor "public" for First Amendment purposes. *Id.* Those are the facts here and accordingly, *Beckman I* is not persuasive.

More importantly, Defendants do not otherwise substantively engage in a state action analysis sufficient for this Court to conclude that ASM Global can be considered a state actor. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."). Indeed, the state action inquiry is "necessarily fact-found," *see United Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982)), and requires the application of one of four tests, *see Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 738 (7th Cir. 2015) (noting the various

15

state action tests). Defendants do not explain why the actions alleged in the SAC necessarily lead to the conclusion that ASM Global is a public actor or even apply the facts to any state action test. [Dkt. No. 88 at 7; Dkt. No. 92 at 4.]

The Court has doubts as to whether a private security operator is a public actor for First Amendment purposes. *See, e.g.*, *Gannett Satellite InfoNetwork, Inc. v. Berger*, 894 F.2d 61, 67 (3d Cir. 1990) (concluding that concessionaires leasing space at Newark Airport were private entities for First Amendment purposes); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1448–57 (10th Cir. 1995) (finding that private security company's pat-downs at a publicly leased concert venue was not state action under any of the state action tests); *Ponce v. Basketball Fed'n of P.R.*, 760 F.2d 375, 381–82 (1st Cir. 1985) (stating that private sporting organization's revocation of plaintiff's right to play in basketball league did not constitute state action despite the league's use of public recreational facilities). While reaching no definitive conclusion on this issue for now, the Court rejects Defendants' argument at this early stage.

The Court also rejects Defendants' urging that Plaintiffs' lawsuit must fail because it constitutes an as-applied First Amendment violation. [Dkt. No. 88 at 6–8; Dkt. No. 92 at 4.] Defendants maintain that the Court need not engage in a "forum based" approach because that analysis "only applies when reviewing restrictions that the government seeks to place on the use of its property." [Dkt. No. 92 at 4.] (citing *Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992)). Here, Defendants argument goes, the nature of Plaintiffs claims do not concern restrictions Defendants allegedly placed on Soldier Field.

16

The Court disagrees with this framing. The SAC alleges that Defendants violated the IHRA by acting or failing to act in particular ways. [Dkt. No. 84 at ¶¶ 96–101.] It alleges that Defendants failed to enforce the IHRA's public accommodation provision by failing to enforce the Soldier Field Code of Conduct or implement the Three-Step Protocol, among other things. [*Id.* at ¶ 85.] The relief requested—enforcement of fan codes against discriminatory behavior—constitutes "restrictions that the government seeks to place on the use of its property." *Int'l Soc.*, 505 U.S. at 678.

This is all to say that Court does not have sufficient facts to conclude what type of forum Soldier Field is. *See Albrecht v. Metro. Pier & Exposition Auth.*, 338 F. Supp. 2d 914, 924–25 (N.D. Ill. 2004) (concluding that the Court lacked sufficient facts at the motion to dismiss stage to conclusively determine the type of forum McCormick Place was for First Amendment purposes). As the parties point out, courts have not uniformly agreed across the board as to what type of forum sporting arenas are. *Compare Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1018 n.8 (D.C. Cir. 1988) (stating that it is not "dispositive" that other stadiums were considered nonpublic forum); *with Int'l Soc'y for Krishna Consciousness, Inc. v. N.J. Sports & Exposition Auth.*, 691 F.2d 155, 161–62 (3d Cir. 1982) (finding that the New Jersey Meadowlands sport complex was a nonpublic forum); *and Hubbard Broad., Inc. v. Metro Sports Facilities Co.*, 797 F. 2d 552, 555–56 (8th Cir. 1986) (finding that the Minneapolis Metrodome to be a nonpublic forum). Unhelpfully, the parties' briefs do not engage in more than a paragraph of analysis on this question, further confirming that the

arguments are premature. [Dkt. No. 91 at 12–13; Dkt. No. 92 at 4.] The Court cannot yet reach this question as a matter of law. *Albrecht*, 338 F. Supp. 2d at 924–25.

At bottom, the Court recognizes that First Amendment analysis, including the forum analysis and the state action inquiry, is inherently fact-bound analysis. *See Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 816 (7th Cir. 2009) (quoting *Brentwood*, 531 U.S. at 295–96) (observing that the district court must make a "normative judgment" under which "[n]o one fact can function as a necessary condition [for state action] across the board" and no "set of circumstances [is] absolutely sufficient" to establish state action); *see also Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chi.*, 45 F.3d 1144, 1152 (7th Cir. 1995) (noting that "[d]etermining the government's intent [in relation to a forum] is an inherently factual inquiry" and as such "[a] district court must therefore develop findings on matters such as the forum's past uses, the government's *consistent* policy and practice and the forum's compatibility with expressive activity" (emphasis in original)). As such, the Court's conclusion for purposes of dismissal is limited: the Court rejects Defendants' First Amendment arguments at this juncture. Discovery will likely shed light on the factual intricacies of these issues, and there is no bar to future arguments on this question once the parties have engaged in fact discovery.

   2. *The Tort Claims Immunity Act*

Defendants argue that they are immune from liability under the Tort Claims

Immunity Act, 745 Ill. Comp. Stat. ("ILCS") 10/2-103 and 10/2-109.[7] [Dkt. No. 88 at 13–14.] The General Assembly enacted the Tort Immunity Act ("the Act" or "TIA") "to protect local public entities and public employees from liability arising from the operation of government." 745 ILCS 10/1-101.1(a). The Act only affects a plaintiff's right to request damages; it does not restrict the right to obtain injunctive or declaratory relief against a local public entity or public employee. *Id.* § 2-101; *Raintree Homes, Inc. v. Village of Long Grove*, 807 N.E.2d 439, 444 (Ill. 2004). Relevant here, the TIA provides that a "local public entity is not liable for . . . failing to enforce any law," 745 ILCS 10/2-103, or "for an injury resulting from an act or omission of its employee where the employee is not liable," 745 ILCS 10/2-109.

The Court looks to state immunity rules to determine whether a defendant is immune from liability under state law. *See Benning v. Bd. of Regents of Regency Univs.*, 928 F.2d 775, 777 (7th Cir. 1991) ("Under the *Erie* doctrine, state rules of immunity govern actions in federal court alleging violations of state law."). State law immunity, like federal immunity, constitutes an affirmative defense. *See Van Meter v. Darien Park Dist.*, 799 N.E.2d 273, 280 (Ill. 2003). The government bears the burden of establishing that the Act bars liability, and the Act is "strictly construed

---

[7]    While Defendants cite to 745 Ill. Comp. Stat. Ann. 10/2-104, the Court interprets their claim to be under 745 Ill. Comp. Stat. Ann. 10/2-109, given the text they cite in-line. *Compare* 745 Ill. Comp. Stat. Ann. 10/2-104 ("A local public entity is not liable for an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order or similar authorization where the entity or its employee is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked.") *with* 745 Ill. Comp. Stat. Ann. 10/2-109 ("A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable.").

against the public entities involved." *Id.* at 286.

The Court agrees with the Plaintiffs that it is doubtful that the Act bars their claims against the Park District. While the Illinois Supreme Court has not decided the issue, relevant Illinois appellate court decisions weigh against Defendants' reading. *See People ex rel. Birkett v. City of Chicago*, 758 N.E.2d 25, 30 (Ill. App. Ct. 2001) ("[T]he Tort Immunity Act applies only to tort actions and does not bar actions for constitutional violations."); *Firestone v. Fritz*, 456 N.E.2d 904, 908 (Ill. App. Ct. 1983) (finding that City of Highland Park was not immune under the Act from an equal protection claim rooted in the Illinois constitution because "[t]he Tort Immunity Act applies only to tort actions and does not bar a civil rights action" (citation omitted)); *Streeter v. Winnebago County*, 357 N.E.2d 1371, 1373 (Ill. App. Ct. 1976) (noting that the Act's title "clearly indicates it is intended to apply to cases arising in one context or another under the law of torts," not constitutional actions).

In an interlocutory appeal on the certified question of whether the Act applies to a civil action under the IHRA where the plaintiff seeks damages, attorney's fees, and costs, the Illinois Supreme Court vacated a lower court order allowing such immunity. *See Rozsavolgyi v. City of Aurora*, 102 N.E.3d 162, 171–72 (Ill. 2017). The Illinois Supreme Court expressly found that existing appellate caselaw, namely, *Birkett*, *Firestone*, and *Streeter*, already affirmatively answered that the Act only grants immunity to public entities in actions that sound in tort. *Id.* at 171; *see also Blount v. Stroud*, 904 N.E.2d 1, 9 (Ill. 2009) ("[A]n action to redress a civil rights violation has a purpose distinct from a common law tort action."). At least one court

within this district similarly concluded that TIA immunity extends only this far. *See Howard v. Cook Cnty. Sheriff's Off.*, 2022 WL 1404833, at *16 (N.D. Ill. May 4, 2022) ("Although the question is a close one, the Court resolves . . . [that] [p]revailing Illinois state law holds that the TIA does not apply to claims that do not sound in tort."). While not dispositive, this is certainly persuasive that dismissal now is improper.

Nor is the Court persuaded by Defendants' reliance on Illinois caselaw, *Raintree Homes, Inc. v. Village of Long Grove.* 807 N.E.2d 439 (Ill. 2004). Defendants cite to one sentence in the *Raintree* opinion that reads "while we do not adopt or approve of the appellate court's reasoning that the Tort Immunity Act categorically excludes actions that do not sound in tort, this court can affirm the appellate court on any basis present in the record." *Id.* at 447 (citation omitted). In 2017, the Illinois Supreme Court in *Rozsavolgyi* significantly narrowed the interpretation of this sentence. *See Rozsavolgyi*, 102 N.E.3d at 172 ("*Raintree Homes* did not 'impliedly reject' the appellate court's holdings [that the Act categorically excludes actions that do not sound in tort] but instead made clear that the Illinois Supreme Court was not adopting or approving of the appellate court's reasoning and was affirming on a different ground."). The Court rejects the Park District's reliance on *Raintree*.[8]

---

[8]     The Court similar finds the other citations unpersuasive. The Park District's citation to *Mansfield v. Chicago Park District Group Plan* is concerning. It cites only to one portion of a sentence in the case. [Dkt. No. 88 at 14 (citing *Mansfield v. Chicago Park Dist. Grp. Plan*, 946 F. Supp. 586, 593 (N.D. Ill. 1996) ("In any event, the Illinois Tort Immunity Act applies only to lawsuits brought under Illinois common law or an Illinois statute.").] Yet, two sentences later, the *Mansfield* court states that "application of the Tort Immunity Act is limited to tort actions." *Mansfield*, 946 F. Supp. at 593. The remaining cases that the Park District relies on are tort actions. *See Reyes v. Bd. of Educ. of City of Chi.*, 139 N.E.3d 123, 128 (Ill. App. Ct. 2019) (underlying claim of sexual assault); *Anthony v. City of Chicago*, 888

That said, the Court need not decide this matter definitively now, as dismissal on these grounds would be premature. The Seventh Circuit has repeatedly cautioned that, "[b]ecause an immunity defense usually depends on the facts of the case, dismissal at the pleading stage is inappropriate." *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000). Given the early stage of this proceeding, Defendants may wish to renew these objections at summary judgment if they believe them to have merit.

## IV. Conclusion

For the reasons stated above, Defendants' motion to Dismiss is denied. [Dkt. No. 87.] The case remains set for a status hearing on June 27, 2023, at 9 a.m.

Enter: 21-cv-5581
Date: June 22, 2023

_____
Lindsay C. Jenkins
United States District Judge

---

N.E.2d 721, 7724 (Ill. App. Ct. 2008) (underlying claims of wrongful death and personal injury). As such, these cases are not dispositive of this issue.