UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Jordan Penland, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> Chicago Park District, *et al.*, <br><br> *Defendants*. | No. 21 CV 5581 <br><br> Judge Lindsay C. Jenkins |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Jordan Penland, Karl Gerner, Edward (Ted) Burke, and Paul C. Burke[1] filed this lawsuit in October 2021 and filed the operative Second Amended Complaint in March 2023. [Dkt. 84.] Plaintiffs allege that the Chicago Park District and Soldier Field's Management Company, SMG[2] violated the Illinois Human Rights Act by denying them the full and equal enjoyment of the 2019 Gold Cup Final Soccer Match held at Soldier Field. The parties have filed cross motions for summary judgment. [Dkt. 142, 145.] For the reasons explained below, the Court grants Defendants' motion for summary judgment and denies Plaintiffs' motion.

**I. Factual Background**[3]

Penland, Gerner, and Paul are gay men, and Ted is a heterosexual man. [Dkt. 154 at ¶¶ 1, 3.][4] All the Plaintiffs bought tickets to the Gold Cup Final ("the Match") of the Confederation of North, Central America and Caribbean Association Football between the U. S. Men's National Soccer Team and the Mexico Men's National Soccer Team, which occurred on July 7, 2019, at Soldier Field in Chicago, Illinois. [*Id.* at ¶ 2.] Chicago Park District (CPK) owns Soldier Field and had a contractual relationship with ASM Global/SMG to serve as general manager and operator of Soldier Field. This included responsibility for security and crowd management during

---

[1] The Court refers to Ted and Paul Burke by first name.
[2] Defendant SMG was served as "ASM Global," and Plaintiffs often use the abbreviation "ASM." The Court uses SMG to reflect the name used by employees of this entity. [Dkt. 147-10 at 10:22–24.]
[3] The Court draws on the parties' Local Rule 56.1 statements to recount the facts, which are undisputed unless otherwise noted.
[4] Ted Burke's sexuality is not explicitly articulated in either parties' Rule 56.1 statement, but it is mentioned in the operative complaint. [Dkt. 84 at ¶ 3.] Ted Burke's sexuality does not impact the application of the IHRA in this case, which protects against discrimination based on actual or perceived sexual orientation. 775 ILCS 5/1-103(Q).

events at Soldier Field. [*Id.* at ¶¶ 4–6.] SMG, in turn, contracted with Monterrey Security, a private entity, to provide security services at Soldier Field for over two decades, including during the Match. [*Id.* at ¶ 9, 11.] Defendants dispute the specific security services SMG was responsible for providing during the Match, but it is undisputed that SMG and its subcontractor provided security services at Soldier Field. [*Id.* at ¶ 10.]

The Chant "*eeeh puto!*" is a homophobic slur and vulgar term for a male sex worker. [*Id.* at ¶ 12.] At matches between the U.S. and Mexican men's national teams in other venues, Plaintiffs had the Chant directed at them, with one instance escalating to physical violence against Paul and Ted Burke. [*Id.* at ¶ 16.] Prior to the Match at Soldier Field, Paul sent identical emails to CPK and SMG warning them about the Chant, outlining its history, and asking Defendants to take steps to "stop homophobic fan misconduct." [*Id.* at ¶ 28.] CPK disputes whether it received the email, but SMG admits that it did. [*Id.* at ¶ 29.] SMG circulated the email to senior managers and outside counsel. [*Id.* at ¶ 34.] Paul never received a response from either Defendant. [*Id.* at ¶ 30.] Other than sending the email to senior managers and outside counsel, SMG did not change any of its normal procedures to address the Chant before the Match. [*Id.* ¶ 37.]

Soldier Field has a Code of Conduct, but the parties dispute who maintains and enforces it. [Dkt. 156 at ¶ 16–19.] Defendants claim to generally prioritize de-escalation services when addressing security incidents at Soldier Field, but Plaintiffs dispute this by pointing to instances when individuals were removed from the stadium for one reason or another. [*Id.* at ¶ 22.] It is undisputed that the Defendants used the same preparations and procedures leading up to the Match as they did for all other events held at Soldier Field in and around 2019. [*Id.* at ¶ 40.]

On the day of the Match, Plaintiffs wore U.S. Men's National Soccer Team Pride Month jerseys to the Gold Cup Final. [Dkt. 154 at ¶ 3.] The rainbow numbering on the back of the jerseys "enabled other attendees, as well as stadium officials, to identify and associate each Plaintiff with the LGBTQ+ community." [*Id.*]

Once the Match began, the Chant occurred at least four times in the first ten minutes. [*Id.* at ¶ 41.] After repeatedly hearing the Chant, Paul sent a text message to the fan security number posted on Soldier Field's website asking officials to "stop this misconduct and enforce the stadium code of conduct." [*Id.* at ¶ 42.] SMG posted an incorrect security number, and its command center did not receive any messages during the Match. [*Id.* at ¶¶ 45–46.] Plaintiffs testified that they felt targeted by the crowd and the people sitting around them who repeated the Chant, and they felt unsafe throughout the Match. [*Id.* at ¶¶ 47–48.] Plaintiffs admit they used the restroom and purchased concessions, but allege they altered their behavior throughout the Match by traveling in pairs or drinking less alcohol because they feared for their safety. [Dkt. 156 at ¶¶ 55–57.] Plaintiffs considered moving seats but

2

decided against it. [*Id.* at ¶ 61.] Plaintiffs' tickets "did not expressly provide" an option to move sections. [*Id.*]

Paul spoke to an usher or security official during halftime to express disappointment with the inaction to address the Chant. The identity and security-related responsibilities, if any, of the actual person Paul spoke with is unknown (and thus is disputed). [Dkt. 154 at ¶¶ 49, 51.] Defendants admit that the typical protocol for a security official "when confronted with a fan safety issue is to contact a supervisor, which would then be communicated to the Command Center." [*Id.* at ¶ 51.] Ultimately, the Chant occurred 28 times. [*Id.* at ¶ 76.] Plaintiffs stayed at Soldier Field for the entire Match, but say they opted to stay well after the event ended due to safety concerns. [Dkt. 156 at ¶ 68.] There is no evidence of anyone being physically harmed at Soldier Field on the day of the Match due to the Chant. [*Id.* at ¶ 70.]

## II. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When reviewing cross-motions for summary judgment, all facts and reasonable inferences are construed in favor of the party "against whom the motion under review was made." *Frazier-Hill v. Chicago Transit Auth.*, 75 F.4th 797, 801 (7th Cir. 2023). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (internal quotation omitted). But defeating summary judgment requires evidence, not mere speculation. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021).

## III. Analysis

Under the Illinois Human Rights Act, "[i]t is a civil rights violation for any person on the basis of unlawful discrimination to…[d]eny or refuse to another the full and equal enjoyment of the facilities, goods, and services of any public place of accommodation." 775 ILCS 5/5-102. Illinois courts have identified that "[a]s remedial legislation, the Act must be liberally construed to achieve its purpose." *M.U. by and through Kelley U. v. Team Illinois Hockey Club*, 240 N.E.3d 446, 453 (Ill. 2024) (citing *Sangamon Cnty. Sheriff's Dept. v. Ill. Hum. Rts. Comm'n*, 557 N.E.3d 39 (Ill. 2009)).

3

To establish a prima facie public accommodation case, a Plaintiff must show the following: "(1) he is a member of a protected class, (2) he attempted to exercise the right to the full benefits and enjoyment of a place of public accommodation, (3) he was denied those benefits and enjoyment, and (4) he was treated less favorably than similarly situated persons outside of his protected class." *Straw v. Ill. State Bd. Of Elections*, 2020 WL 5536728 at *6 (Ill. App. Ct. Sept. 15, 2020), *appeal denied*, 159 N.E.3d 945 (Ill. 2020).

Here, the parties do not dispute that Plaintiffs are members of a protected class and that they attempted to exercise the full benefits and enjoyment of a place of public accommodation. The parties disagree on the final two prima facie showings: what services Plaintiffs were denied and whether Plaintiffs were treated less favorably than those outside their protected class. The Court considers each below.

### A. Denial of Benefits and Enjoyment

To establish a public accommodation claim, a plaintiff must show that a defendant deprived her of a preexisting good or service;[5] a plaintiff cannot bring a public accommodation case arising from a service a defendant did not provide. *Straw*, 2020 WL 5536728 at *6 ("[G]ranting the accommodations requested by Straw did not fall within the scope of services provided by the Board, and, thus, any denial of those accommodations cannot be considered a denial of the Board's services.") The Illinois Human Rights Commission has identified that "[t]he meaning of full and equal enjoyment encompasses customers being able to fully avail themselves of all services offered by a public place of accommodation." *In the Matter of the Request for Review By: Melissa "Skyler" Hyatt, Petitioner*, 2024 WL 2845071 at *3 (Ill. Hum. Rts. Comm'n May 29, 2024); *see also Hobby Lobby Stores, Inc. v. Sommerville*, 186 N.E.3d 67, 78 (Ill. Ct. App. Aug. 13, 2021).

Plaintiffs argue that they "were denied the full and equal enjoyment of Soldier Field during the 2019 Gold Cup Final because they were subjected to unaddressed and unabated discriminatory conduct targeting them as gay men," including through an increased potential of physical danger. [Dkt. 146 at 13–16.] They maintain that they requested assistance and security services both before and during the Match, but Defendants "provided no crowd management services to address, let alone stop, the Chant." [*Id.* at 14.]

Defendants argue that Plaintiffs were not denied the benefits and enjoyment of a place of public accommodation because they received every good and service they

---

[5] Because the Court concludes there was denial of a service, it does not address Plaintiffs alternative argument—"that public accommodation claims do not necessarily have to include a traditional 'denial of service' requirement." [Dkt. 146 at 20 (citing *Turner g. Wong*, 832 A.2d 340, 345–46 (N.J. Super. Ct. App. Div., 2003); *Kirt v. Fashion Bug | 3253, Inc.*, 479 F.Supp.2d 938, 942–43 (N.D. Iowa 2007).]

4

contracted for when purchasing tickets—including taking their seats, watching the Match, wearing their jerseys, using the restroom, purchasing concessions, etc.—such that "they were able to access, enjoy and participate in the full experience of" attending the Match. [Dkt. 143 at 22 (citing *Gaylord v. IHRC*, 2020 WL 2791827, at *5 (Ill. App. Ct. 2020) (no discrimination where white woman received services before a Black man because he ultimately received services); *Mallett v. Human Rights Comm'n*, 2021 WL 1856925 (Ill. Ct. App. 2021) (no discrimination arising from a delay rather than a denial of service).] Relying on the Court's prior order at the motion to dismiss stage, (*see* dkt. 77 at 10), Defendants maintain that Plaintiffs' claim necessarily fails because it is premised on the failure to create a service, specifically "that Defendants should have done more" in advance of or in response to the Chant, including by responding to Paul's pre-Match email, responding to his text message to the fan security number, or reprimanding or ejecting fans who participated in the Chant. [Dkt. 143 at 22.]

It is true that many of the relevant Local Rule 56.1 statements are premised on how Defendants should have changed or implemented existing preparation and crowd management strategies in response to Paul's email, text message, and in-person complaints of inaction. For example, Plaintiffs emphasize that Defendants never "had, or modified, its crowd management plan or security services to address the Chant, or even alerted its workforce about the Chant." [Dkt. 146 at 7, Dkt. 154, ¶¶ 37, 38.] They also list more than a dozen crowd management procedures Defendants could have, but did not, implement at the Match. [Dkt. 154, ¶ 78.]

Nevertheless, the core of Plaintiffs' claim is that Defendants failed to provide "security, usher, and Code of Conduct enforcement services, which were all 'existing' services Defendants provided to others at the Match." [Dkt. 163 at 6.] There is no genuine dispute that security services, including in the form of Soldier Field's Code of Conduct, existed at the time of the Match. [Dkt. 154 at ¶¶ 56–59.] As explained in the prior Order, denial of existing services arguably includes the failure to provide existing security services. [Dkt. 77 at 9–10 (explaining that the "denial of a concrete service (such as security) suggests a more traditional claim of disparate treatment discrimination.")]

The Code of Conduct states:

> Unruly or inconsiderate behavior will not be tolerated and may be grounds for ejection from the stadium, revocation of ticket privileges, and subject to civil action and criminal action. Such behavior includes, but is not limited to: intoxication, profane, disruptive or abusive language or gestures, offensive or disorderly conduct, throwing objects, excessive standing in the seating area, smoking anywhere in the stadium, bringing any prohibited items into the stadium, entering or attempting to enter the field level or playing field. [Dkt. 154, ¶ 57.]

5

It is undisputed that the Code was in effect as of July 2019, and that SMG, through Monterrey, was responsible for its enforcement. [*Id.*, ¶ 57, 59.] The Code established actions officials could take in response to abusive language and offensive or disorderly conduct, including a warning, ejection, revocation of ticket privileges, or arrest. [*Id.* at ¶¶ 58, 59, 67, 70.] Given these undisputed facts, Plaintiffs have demonstrated that they requested but were denied security services and that security was a preexisting service Defendants provided.

### B. Less Favorable Treatment

A public accommodation claim also requires a plaintiff to show that "he was treated less favorably than similarly situated persons outside of his protected class." *Straw*, 2020 WL 5536728 at *6. Plaintiffs argue that they were treated less favorably because Defendants would have enforced the Code differently if the Chant were racist. [Dkt. 146 at 16–18; Dkt. 163 at 15–17.] The Court concludes that Plaintiffs have not met their burden as to this requirement.

Illinois courts look to cases interpreting federal statutes with similar language when evaluating claims under the IHRA. *See M.U. by and through Kelly U.*, 240 N.E.3d at 457 (citing *Zaderaka v. Ill. Hum. Rts. Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989)). In the employment context, a similarly situated individual is "directly comparable to [the plaintiff] in all material respects." *Fuller v. McDonough*, 84 F.4th 686, 691 (7th Cir. 2023) (citing *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). At the same time, the inquiry used to identify a similarly situated comparator "is flexible, common-sense, and factual" rather than requiring "a mechanical 'magic formula.'" *Johnson v. Advoc. Health and Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018) (citing *Coleman v. Donahue*, 667 F.3d 835, 841 (7th Cir. 2012)).

*Straw* is instructive. Straw, a disabled individual seeking to be included as a candidate on a primary ballot for a 2016 Congressional seat, was required to submit a petition for his nomination containing a certain number of eligible voter signatures. *Id.* at *1. After explaining that Straw had not shown that the State Board of Elections denied him the benefits of administering election law services, the court found Straw had not identified any candidate who did not have a disability but was treated better than him. *Id.* at *7. That is, Straw had not identified any individuals who were permitted to appear on the ballot *without* obtaining the required number of signatures. *Id.* at *6–7. *See also Ellis v. Dept. of Hum. Rts.*, 2020 WL 1082614 at *4 (Ill. App. Ct. Jan. 14, 2020) ("Ellis did not present any evidence that Capital One treated similarly situated non-black or non-light-skinned persons more favorably" because "she presented no evidence that other customers outside her protected classes, *i.e.*, persons of a different race or color, were permitted to use the restroom for personal hygiene purposes or were not asked to leave after insulting Capital One employees.") *Ellis v. Ill. Hum. Rts. Comm'n*, 2020 WL 2395615 at *6 (Ill. App. Ct. May

6

12, 2020) (petitioner "presented no evidence showing that other customers of a different race consigned a pre-owned item with [the consignment shop] and that the item was posted online more quickly than petitioner's handbag or was listed as 'new' when it was not.")

Here, Plaintiffs' primary argument for less favorable treatment relies on the deposition testimony of various CPK, SMG and Monterrey employees and officials who testified they would have reacted differently if the Chant had involved a racial slur—essentially that "a mass racist chant would have been taken seriously." [Dkt. 163 at 12; Dkt. 154 at ¶¶ 68–69, 79; Dkt. 146 at 15–17.] For instance, Plaintiffs point to the testimony of Marty McAndrew who testified that he "would listen to suggestions of ways to curtail a racist chant," "would consider whether to adopt those measures if offered," and "would send a message along to security or police if a patron sent a message that a KKK demonstration was going to happen at an event at Soldier Field." [Dkt. 163 at 12.]

But as Defendants persuasively argue, evidence about how certain employees would have reacted to a different email or to a different chant or demonstration is at best hypothetical. [Dkt. 153 at 13.] It is not evidence that Defendants treated similarly situated patrons more favorably than they did the Plaintiffs.

Plaintiffs offer no support in the case law for a hypothetical comparator like this, and the Court's research has found none. Employee testimony about the response he or she would have had to a racist chant at the Match does not reveal substantial similarity. For example, there is no way to meaningfully compare the email Paul sent in advance of the Match warning of the Chant to a hypothetical email sent to the same employees warning of a racist chant. Nor does the hypothetical comparison eliminate other important variables, such as the circumstances surrounding a racist chant or demonstration, which are needed to isolate discriminatory intent.

Ultimately, the Court cannot see how Plaintiffs' hypothetical comparison satisfies the burden to identify a similarly situated actor outside of the protected class who received more favorable treatment than they did. They have not identified anyone of a different sexual orientation who raised concerns about the Chant but received a better response. Even at a higher level of generality, they have not identified any individual or group of individuals who requested security services in response to a similar demonstration at a similar event but who received more favorable treatment or a better response.

To be sure, Plaintiffs have identified three instances where attendees were removed from Soldier Field for Code of Conduct violations, but none involve similarly situated patrons or similar circumstances. [Dkt. 154 at ¶¶ 67, 70.] Only one instance occurred during the 2019 Gold Cup Final. [*Id.* at ¶ 67.] In that case, a Match attendee

was ejected for "profane, disruptive, or abusive language" after threatening physical violence to other attendees. [*Id.*] Nothing about ejecting this attendee for these violations shows better or more favorable treatment than what Plaintiffs received given the circumstances of the Chant. It simply demonstrates an instance at the Match where the Code of Conduct was enforced.

The other identified instances involving Code of Conduct violations fare no better because they are too factually distinct to allow for a meaningful comparison. One incident from December 2018 concerned a patron who used a racial slur toward another person; the other incident from January 2019 involved a sexual comment directed toward another patron. [*Id.* at ¶ 70.] Neither incident involved anything resembling conduct like the Chant, nor do the parties' submissions provide much in the way of additional details about these incidents. As a result, they do not provide a meaningful comparison or show better treatment of a similarly situated person.

Plaintiffs have not identified any similarly situated individual or individuals outside of their protected class who received more favorable treatment. As such, they have not established evidence from which a jury could reasonably find the fourth prima facie requirement for a public accommodation claim. Because no reasonable fact finder could do so, Defendants are entitled to summary judgment on this claim.[6]

## IV. Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment and denies Plaintiffs' motion for summary judgment.

Enter: 21-cv-5581
Date: December 31, 2024

 Lindsay C. Jenkins
 United States District Judge

---

[6] Defendants also propose an alternate First Amendment theory to support granting summary judgment. As Defendants note, the Supreme Court has stated that "[w]hen a state public accommodations law and the Constitution collide, there can be no question which must prevail." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2315 (2023). The Court does not reach or evaluate the merits of the Free Speech and forum analysis arguments raised throughout the parties' filings except to note that in the same case, the Supreme Court reiterated its earlier conclusion that "there are no doubt innumerable goods and services that do not require a First Amendment analysis." *Id.* (quoting *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1728 (2018)). The goods and services at issue in this case are not expressive in nature, placing them beyond the ambit of cases involving public accommodation and Free Speech.

8